No. 23-10600

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA ex rel. SEAN GOSE, as Personal Representative of the Estate of DENNIE GOSE, et al.,

*Relators-Appellants,*

v.

NATIVE AMERICAN SERVICES CORPORATION, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the Middle District of Florida
No. 8:16-CV-03411-SCB-AEP

## APPELLANTS' OPENING BRIEF

Glenn E. Chappell
Jonathan K. Tycko
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., N.W.
Suite 1010
Washington, D.C. 20006
Tel: (202) 973-0900
Fax: (202) 973-0950

*Attorneys for Appellants
Sean Gose, as Personal
Representative of the
Estate of Dennie Gose,
and Brent Berry*

# CERTIFICATE OF INTERESTED PERSONS

Relators-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

- American Financial Group (AFG) – Parent Company of Great American Insurance Group, Inc.

- Berry, Brent – Plaintiff/Appellant

- Boynton, Brian – Principal Deputy Assistant Attorney General

- Bucklew, Hon. Susan C., – United States District Judge

- Carlton Fields, P.A. – Counsel for Appellee Great American Insurance Company

- Cendali, Allison – Counsel for the United States Justice Department

- Chappell, Glenn E. – Counsel for Sean Gose and Brent Berry

- Conigliaro, Matthew J. – Counsel for Great American Insurance Group, Inc.

- Cummings, Brian R. – Counsel for Native American Services Corporation

- Emden, Christopher – Assistant United States Attorney

- Estate of Dennie Gose – Deceased Plaintiff-Relator

- Feinberg, Matthew – Counsel for Native American Services Corporation

- Gose, Sean, as Personal Representative of the Estate of Dennie Gose – Plaintiff/Appellant

- Gouinlock, Susan – Counsel for Sean Gose and Brent Barry

- Great American Insurance Group, Inc. – Defendant

- Handberg, Roger – United States Attorney

- Hoyle, Erin J. – Counsel for Great American Insurance Group, Inc.

- Majors, Jay – Counsel for the United States Department of Justice

- Native American Services Corporation – Defendant

- PilieroMazza PLLC – Counsel for Appellee NASCO

- Porcelli, Hon. Anthony E., – United States Magistrate Judge

- Reinecker, Todd M. – Counsel for Native American Services Corporation

- Schwartz, Adam P. – Counsel for Great American Insurance Group, Inc.

- Stromgren, Elaine – Counsel for Sean Gose and Brent Berry

- Tycko, Jonathan – Counsel for Sean Gose and Brent Berry

- Tycko & Zavareei LLP – Counsel for Appellants

- United States Department of Justice

- Wilbanks and Gouinlock LLP – Counsel for Appellants

- Wilbanks, Marlan – Counsel for Sean Gose and Brent Barry

- Yavelberg, Jamie A. – Counsel for the United States Department of Justice

# STATEMENT REGARDING ORAL ARGUMENT

This case presents questions concerning proper interpretation of the statute and regulations that govern the Section 8(a) program, pursuant to which certain government contracts are set-aside for entities owned and controlled by socially and economically disadvantaged persons. This Court's ruling may thus have wide-ranging impacts on the government's contracting activities. In addition, the case presents questions under the False Claims Act (FCA) and application of Rule 9(b) of the Federal Rules of Civil Procedure that are relevant to many current and future cases in this Circuit and elsewhere. These questions include whether and how far the FCA reaches claims of fraudulent inducement, and what level of detail Rule 9(b)'s particularity requirement mandates in a fraudulent-inducement case premised on an entity's failure to disclose its ineligibility to bid on a government contract during the bidding process, rather than on affirmative misrepresentations in claims for payments.

The Court's decision thus has the potential to affect a wide range of cases, particularly FCA cases brought by either the government or FCA relators. Appellants believe oral argument would aid the Court in deciding these important issues.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................... 5

ISSUES PRESENTED ......................................................................................... 5

STATEMENT OF THE CASE ........................................................................... 7

    I.      Legal Background .................................................................................. 7

          A.      The 8(a) Program ................................................................. 7

          B.      Law Governing Termination of 8(a) Contracts ............................ 9

    II.      Factual Background .............................................................................. 11

    III.    Procedural History ............................................................................... 14

LEGAL STANDARD .......................................................................................... 17

SUMMARY OF THE ARGUMENT ................................................................ 17

ARGUMENT ......................................................................................................... 21

    I.      The FAC pled actionable falsity with ample particularity. ...................... 22

          A.      The District Court erred in concluding that the term "Participant" excludes graduated entities ........................................ 23

          B.      The FAC pled facts making it more than plausible that Dennie Gose relinquished unconditional ownership of DWG, but even if it didn't, the FAC established that Gose relinquished *control* of DWG. ............................................................ 33

          C.      The fraudulent-inducement theory pled here is actionable under the FCA ............................................................................. 38

          D.      The FAC pled falsity with ample particularity ............................... 44

    II.      The FAC sufficiently pled conspiracy claims .......................................... 48

CONCLUSION ...................................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*Advanced Concept Innovations, LLC v. Kimberly-Clark Glob. Sales, LLC,*
No. 8:21-CV-1493-MSS-CPT, 2021 WL 8084310 (M.D. Fla. Oct. 29, 2021) .......... 46

*Austin v. Auto Owners Ins. Co.,*
No. CIV.A. 12-0345-WS-B, 2012 WL 3101693 (S.D. Ala. July 30, 2012) ................ 46

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................. 17

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.,*
116 F.3d 1364 (11th Cir. 1997) ............................................................................... 45

*CBS Inc. v. PrimeTime 24 Joint Venture,*
245 F.3d 1217 (11th Cir. 2001) ............................................................................... 36

*Friedlander v. Nims,*
755 F.2d 810 (11th Cir. 1985) ................................................................................. 45

*Glazer v. Reliance Standard Life Ins. Co.,*
524 F.3d 1241 (11th Cir. 2008) ............................................................................... 26

*Guarantee Ins. Co. v. Merchants Emp. Benefits, Inc.,*
No. CIV A 507-CV-307 CAR, 2008 WL 2559436 (M.D. Ga. June 23, 2008) .......... 46

*Harrison v. Westinghouse Savannah River Co.,*
176 F.3d 776 (4th Cir. 1999) ................................................... 40, 43, 44, 46

*Hopper v. Solvay Pharms., Inc.,*
588 F.3d 1318 (11th Cir. 2009) ............................................................................... 17

*In re Baycol Prod. Litig.,*
732 F.3d 869 (8th Cir. 2013) ............................................................................ 41, 46

*In re David's Custom Roofing & Painting, Inc.,*
SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010) ............................................ 33

*In re Reality Techs., Inc.,*
SBA No. BDP-455, 2012 WL 8134444 (Nov. 21, 2012) ............................................ 32

*Maderas Del Siglo XXI-Madesi S.R.L. v. Medley Hardwood, Inc.,*
No. 13-20508-CIV, 2014 WL 12605558 (S.D. Fla. Jan. 6, 2014) ............................... 46

*Marsteller for use & benefit of United States v. Tilton,*
880 F.3d 1302 (11th Cir. 2018) ........................................................................ 41, 43

*Miles Construction, LLC v. United States,*
  108 Fed. Cl. 792 (Fed. Cl. 2013) .................................................................. 37

*Morfa Diaz v. Mayorkas,*
  43 F.4th 1198 (11th Cir. 2022) ................................................................... 17

*Rainwater v. United States,*
  356 U.S. 590 (1958) ..................................................................................... 43

*Sec. & Exch. Comm'n v. Levin,*
  849 F.3d 995 (11th Cir. 2017) ..................................................................... 25

*Size Appeal of: FTSI-Phelps Jv, Appellant,*
  SBA No. SIZ-5583, 2014 WL 4804769 (Aug. 19, 2014) ............................. 32

*United States ex rel. Campie v. Gilead Scis., Inc.,*
  862 F.3d 890 (9th Cir. 2017) ....................................................................... 41

*United States ex rel. Cimino v. Int'l Bus. Machines Corp.,*
  3 F.4th 412 (D.C. Cir. 2021) ....................................................................... 41

*United States ex rel. Feldman v. van Gorp,*
  697 F.3d 78 (2d Cir. 2012) .......................................................................... 41

*United States ex rel. Hendow v. Univ. of Phoenix,*
  461 F.3d 1166 (9th Cir. 2006) ...........................................................41, 42, 43

*United States ex rel. Hunt v. Cochise Consultancy, Inc.,*
  No. 5:13-CV-2168-LCB, 2020 WL 5408212 (N.D. Ala. Sept. 9, 2020) ..................... 42

*United States ex rel. Longhi v. United States,*
  575 F.3d 458 (5th Cir. 2009) ................................................................... 39, 40

*United States ex rel. Marcus v. Hess,*
  317 U.S. 537 (1943) ................................................................................ 39, 40

*United States ex rel. Marsteller v. Tilton,*
  No. 5:13-CV-00830-AKK, 2019 WL 4749986 (N.D. Ala. Sept. 30, 2019) ........ 42, 46

*United States ex rel. McCready v. Columbia/HCA Healthcare Corp.,*
  251 F. Supp. 2d 114 (D.D.C. 2003) ............................................................. 45

*United States ex rel. Reeves v. Mercer Transportation Co., Inc.,*
  253 F. Supp. 3d 1242 (M.D. Ga. 2017) ....................................................... 42

*United States ex rel. Sanchez v. Abuabara,*
  No. 10-61673-CIV, 2012 WL 254764 (S.D. Fla. Jan. 27, 2012) ............... 42, 46

*United States ex rel. Swoben v. United Healthcare Ins. Co.,*
  848 F.3d 1161 (9th Cir. 2016) ..................................................................... 45

*United States v. HPC Healthcare, Inc.,*
  723 F. App'x 783 (11th Cir. 2018) ................................. 48

*United States v. Marte,*
  356 F.3d 1336 (11th Cir. 2004) ..................................... 28

*United States v. Neifert-White Co.,*
  390 U.S. 228 (1968) ................................................. 43, 44

*United States v. Strock,*
  982 F.3d 51 (2d Cir. 2020) .......................................... 38, 39

*United States v. United Techs. Corp.,*
  626 F.3d 313 (6th Cir. 2010) ........................................ 40

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
  579 U.S. 176 (2016) ................................................. 41

*Urquilla-Diaz v. Kaplan Univ.,*
  780 F.3d 1039 (11th Cir. 2015) ..................................... 21, 45, 49

*Veterans Contracting Group, Inc. v. United States,*
  133 Fed. Cl. 613 (Fed. Cl. 2017) ................................... 37

*Yates v. Pinellas Hematology & Oncology, P.A.,*
  21 F.4th 1288 (11th Cir. 2021) ..................................... 21

## Statutes

15 U.S.C. § 632 ........................................................ 7

15 U.S.C. § 637 .................................................... passim

15 U.S.C. § 636 ........................................................ 7

31 U.S.C. § 3729 ...................................................... 21

## Rules

Fed. R. Civ. P. 9(b) .................................................. 47

## Regulations

13 C.F.R. § 124.1 ..................................................... 7

13 C.F.R. § 124.101 ................................................... 7

13 C.F.R. § 124.102 ................................................... 7

13 C.F.R. § 124.103 ........................................................................ 7

13 C.F.R. § 124.104 ........................................................................ 8

13 C.F.R. § 124.105 ....................................................... 7, 23, 35, 36

13 C.F.R. § 124.106 ....................................................................... 34

13 C.F.R. § 124.3 ......................................................................... 36

13 C.F.R. § 124.304 ....................................................................... 27

13 C.F.R. § 124.317 ....................................................................... 29

13 C.F.R. § 124.501 .................................................................... 8, 26

13 C.F.R. § 124.503 .................................................................. 10, 26

13 C.F.R. § 124.507 ....................................................................... 27

13 C.F.R. § 124.515 ................................................................. passim

13 C.F.R. § 124.106 ....................................................................... 23

48 C.F.R. § 1.101 .......................................................................... 31

48 C.F.R. § 16.501-1 ....................................................................... 8

48 C.F.R. § 16.504 .......................................................................... 8

48 C.F.R. § 16.505 .......................................................................... 8

48 C.F.R. § 19.812 ........................................................................ 31

Minority Small Business and Capital Ownership Development Program,
  54 Fed. Reg. 34,692 (Aug. 21, 1989) .......................................... 29

Small Business Size Regulations, 62 Fed. Reg. 43,584 (proposed Aug. 14, 1997) ....... 30

Small Business Size Regulations, 63 Fed. Reg. 35,726 (June 30, 1998) ........................ 30

**Other Authorities**

H.R. Rep. No. 100-460 (1987) ....................................................... 29

U.S. Small Bus. Admin., *Standard Operating Procedure for the Office of Business
  Development* (2016) .................................................................. 31

# INTRODUCTION

This is an appeal of the dismissal of a *qui tam* action under the False Claims Act ("FCA"). Congress created the Section 8(a) program to ensure that "small business concerns owned and controlled by socially and economically disadvantaged individuals . . . have the maximum practicable opportunity to participate in the performance of [government] contracts." 15 U.S.C. § 637(d). Accordingly, the program sets aside certain government contracts for small businesses controlled and at least 51% unconditionally owned by such disadvantaged individuals to ensure they have a fair opportunity to win and benefit from those contracts.

Time and again, the government has made its intent clear: the intended beneficiary of the 8(a) program—the socially and economically disadvantaged individual who made a business eligible for the program in the first place—must retain 51% unconditional ownership and control throughout the life of the contract. Otherwise, the contract is automatically terminated. It said so in the statute creating the 8(a) program, the statute's legislative history, and the regulation implementing the statute. It even said so in this case when it filed a Statement of Interest in the District Court. D.E. 102. That is no surprise because this requirement is necessary to further the purpose of the 8(a) program. If the contract does not terminate when the disadvantaged person loses ownership and/or control, then the benefits of the 8(a) program would flow to *non*-disadvantaged owners, and potentially give large, non-

disadvantaged businesses an unfair edge in competitions for task orders that are intended for 8(a)-eligible businesses.

This case is a prime example of the importance of the 8(a) program's ownership-and-control requirement. The First Amended Complaint ("FAC") alleges that DWG & Associates, Inc. ("DWG") was a small business owned and controlled by Dennie Gose, a socially and economically disadvantaged individual. Based on Gose's disadvantaged status, the government accepted DWG into the 8(a) program and awarded it several contracts set aside for 8(a) small businesses. But when DWG fell into financial hardship, the insurance company that had issued surety bonds on DWG's projects, Defendant Great American Insurance Company ("GAIC"), and another government contractor that was not 8(a) eligible, Defendant Native American Services Corporation ("NASCO"), devised a plan to take over both ownership and control of DWG yet continue to direct DWG to bid on task orders under DWG's existing 8(a) set-aside contracts.

These bids were fraudulent because GAIC and NASCO caused 8(a) set-aside bids to be submitted under DWG's name without disclosing that Gose no longer had control or 51% unconditional ownership of DWG. They thus hid behind DWG's name and Gose's disadvantaged status, avoiding termination of the contracts that was mandatory and should have been automatic under the 8(a) statute and regulations. 15 U.S.C. § 637(a)(21)(A); 13 C.F.R. § 124.515(a). As a result, millions of dollars in government funds went to entities ineligible for the 8(a) program when those funds

should have gone to legitimate 8(a) businesses. GAIC and NASCO thus undermined the 8(a) program's central purpose and violated the FCA.

The District Court dismissed the case on the pleadings. In doing so, it interpreted the regulation governing the 8(a) program to permit schemes like those perpetrated by GAIC and NASCO. Specifically, the District Court concluded that the program's control and 51% ownership requirements do not apply for the life of the contracts specifically set aside for participants in the 8(a) program. Instead, it ruled, those requirements only apply to 8(a) businesses during the time they qualify as "small businesses." Thus, because DWG was no longer a small business at the time Gose was forced to give up ownership and control of it, the District Court ruled that GAIC and NASCO were eligible to bid for work under the contracts and had no duty to disclose the change in ownership to the government.

This was an incorrect construction of the statutory and regulatory requirements. Those provisions allow a business owned and controlled by a qualifying disadvantaged individual to continue to perform work under an existing 8(a) contract after it has "graduated" from the 8(a) program by growing in size to the point it no longer fits within the legal definition of a "small business." The reason for this is clear: allowing a graduated business to do work under its existing 8(a) contracts furthers the 8(a) program's purpose because the benefits continue to flow to the disadvantaged individual who owns and controls the business. But nothing in the statute or the regulations distinguishes between graduated and nongraduated businesses when setting

forth the ownership-and-control requirements. It would be unreasonable to do so because the focus throughout the statute and regulations is on ensuring that disadvantaged individuals—not ineligible businesses or individuals—reap the benefits of the 8(a) program. The District Court's opinion—which never discussed the governing statute or the 8(a) program's purpose and rested on a strained and unsupported definition of the term "Participant" used in the regulation—was incorrect.

The District Court also erred in other ways. It incorrectly interpreted the FCA as well, going against the heavy weight of authority (including guidance from both the Supreme Court and this Court) when it ruled that fraudulently inducing the government to pay by submitting false bids is not a violation of the FCA unless such fraudulent inducement also "extends to a claim for payment" in some way that the District Court did not define but found lacking in the FAC's allegations. D.E. 104 at 5. This restrictive interpretation of the FCA goes against its language and frustrates its broad remedial purpose.

Moreover, the District Court over-enforced Rule 9(b)'s particularity requirement by mandating far more detail in the FCA than would be necessary to serve Rule 9(b)'s purpose of giving defendants notice of the specific fraud alleged against them and giving them an opportunity to prepare a defense. The FAC provides more than enough detail to state its fraud claims with particularity, and its comprehensive allegations give GAIC and NASCO all the information they need to readily obtain any facts not already included in the pleading about the false bids and claims for payment at stake in the case.

This Court should reverse the District Court's decision and allow this case to proceed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331. It entered final judgment in Defendants' favor on November 14, 2022. D.E. 94. Relators moved for reconsideration on December 12, 2022. D.E. 95. The District Court denied the motion for reconsideration on January 25, 2023. D.E. 104. Relators timely appealed on February 23, 2023. D.E. 105. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.      Did the District Court err when it ruled that a business that has "graduated" from the 8(a) program, but that is still bidding on and performing work under contracts set aside for the 8(a) program, is not a "Participant" of that program, and thus is not subject to the program's ownership-and-control requirements, even though that would divert the benefits of 8(a) contracts away from the socially and economically disadvantaged individuals for whom Congress created the 8(a) program, and even though both the governing regulation, 13 C.F.R. § 124.515(a), and statute, 15 U.S.C. § 637(a)(21)(A), by their terms, apply to both graduated and nongraduated businesses?

2.      Did the District Court err when it ruled that the FAC must be dismissed solely because it failed to plausibly allege that Dennie Gose lost 51% unconditional ownership of DWG, even though the governing statute and regulation require both

51% unconditional ownership *and* control of a business to maintain eligibility for the 8(a) program, and the District Court did not identify any deficiencies in the FAC's allegations concerning Gose's loss of control of DWG?

3.       Did the District Court err when it disagreed with the overwhelming weight of authority from federal trial and appellate courts across the country by ruling that fraudulently inducing a government contract by submitting false bids is not actionable under the FCA unless the fraud also "extends to a claim for payment" in some manner that the District Court did not explain?

4.       Did the District Court err when it ruled that the FAC failed to plead the circumstances surrounding GAIC and NASCO's fraud with sufficient particularity to satisfy Rule 9(b), even though the FAC specifically identified the task orders on which GAIC and NASCO falsely bid and made false claims and, as a result, GAIC and NASCO have specific knowledge of the fraud alleged against them and have ample opportunity to prepare a specific defense to the FAC's allegations?

5.       Did the District Court err in ruling that the FAC failed to sufficiently allege a conspiracy, when the FAC detailed the specific meetings and documents involved in the conspiracy, the nature of the conspiracy, its specific plans and goals, and incorporated as an exhibit a written agreement that codified the conspiracy?

# STATEMENT OF THE CASE

## I.     Legal Background

### A.     The 8(a) Program

This case centers on government contracts awarded to DWG pursuant to the government's 8(a) program. The 8(a) program is named after Section 8(a) of the Small Business Act. It is designed to assist small businesses owned and controlled by individuals who are both socially and economically disadvantaged. *See* 15 U.S.C. § 637(a); 13 C.F.R. § 124.1. A small business owned and controlled by such a person may apply to the SBA and, if admitted into the program, is eligible to receive technological, financial, and practical assistance, as well as support through preferential awards of government contracts.

To participate in the 8(a) program, the SBA must certify that the business meets specific criteria. *See* 15 U.S.C. §§ 636(j)(11)(E) & (F); 13 C.F.R. § 124.101. A business qualifies as "small" if it meets the standards set forth in 13 C.F.R. Part 121, *see* 13 C.F.R. § 124.102; 15 U.S.C. § 632(a)(1)-(3), and it is "disadvantaged" if at least 51% of the firm is unconditionally owned and controlled by one or more individuals who are both socially and economically disadvantaged, *see* 15 U.S.C. § 637(a)(4)(A)-(B); 13 C.F.R. § 124.105.[1]

---

[1] "Socially disadvantaged" persons are those "subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups without regard to their individual qualities." 13 C.F.R. § 124.103(a); 15 U.S.C. § 637(a)(5). "Economically disadvantaged" persons are those "whose ability to compete

Once a business is certified to participate in the 8(a) program, it may be eligible to receive preferential contracts—contracts that are awarded outside the standard competitive-bidding process. 8(a) contracts can be awarded on a "sole source" basis (contracts set aside for one business) or on a "competitive" basis (contracts awarded after a bidding process involving two or more 8(a) firms, but not involving other non-8(a) competitors). 13 C.F.R. § 124.501(b).

Such contracts include multiple award or "indefinite-delivery indefinite-quantity" ("IDIQ") contracts. An IDIQ contract provides for an indefinite quantity of supplies or services over a fixed period. 48 C.F.R. § 16.504(a). The government places orders, called "delivery orders" or "task orders," for supplies and services pursuant to an IDIQ. A multiple award contract is a type of IDIQ contract awarded to multiple recipients. *See* 48 C.F.R. § 16.504(c). The multiple award contract defines the type of supplies or services to be provided and the period of performance. *See id.* After a multiple award contract is awarded to a pool of recipients, contract officers then issue individual task orders for supplies or services, with competition for those task orders limited to the awardees of the umbrella multiple award contract. *See* 48 C.F.R. §§ 16.501-1; 16.504; 16.505(b). The contracts at issue in this case were such multiple award contracts, and the fraudulent inducement alleged here relates to task orders under those contracts.

---

in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." 13 C.F.R. § 124.104(a); 15 U.S.C. § 637(a)(6)(A).

## B. Law Governing Termination of 8(a) Contracts

The Small Business Act and its implementing regulations make clear that the 8(a) program is dedicated to supporting businesses owned and controlled by qualifying individuals. The relevant portion of the Small Business Act states:

> [A] contract (including options) awarded pursuant to this subsection shall be performed by the concern that initially received such contract. Notwithstanding the provisions of the preceding sentence, *if the owner or owners upon whom eligibility was based relinquish ownership or control of such concern, or enter into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government* . . . .

15 U.S.C. § 637(a)(21)(A) (emphasis added).

The only exception to this termination requirement is if the SBA grants a waiver. In that regard, the Small Business Act provides that the government may waive mandatory termination only for specified reasons. One of those reasons, important to the interpretive question presented here, is as follows:

> (v) When, in order to raise equity capital, it is necessary for the disadvantaged owners of the concern to relinquish ownership of a majority of the voting stock of such concern, but only if—
>
> (I) such concern has exited the Capital Ownership Development Program;
>
> (II) the disadvantaged owners will maintain ownership of the largest single outstanding block of voting stock (including stock held by affiliated parties); and
>
> (III) the disadvantaged owners will maintain control of daily business operations.

15 U.S.C. § 637(a)(21)(B)(v).

9

The Small Business Act's implementing regulations[2] (promulgated by the SBA, which has authority to administer the 8(a) program) are consistent with this termination requirement. First, those regulations state that preferential 8(a) contracts set aside for small businesses must be completed by the eligible contractor that received the award, unless the contractor seeks a waiver, and that waiver is then granted by SBA. 13 C.F.R. § 124.515(a)-(b). Second, if a business accepted into the 8(a) program grows to be "other than small," it may nevertheless continue to bid on task orders for multiple award contracts the 8(a) business received while it was small. 13 C.F.R. § 124.503(h)(1)(iii).

However, as with the statutory provisions, the regulations do not allow a business to continue bidding on or performing under a contract if the qualifying individual loses ownership and control of the business. The pertinent regulation states:

> An 8(a) contract or order, whether in the base or an option year, must be terminated for the convenience of the Government if . . . [o]ne or more of the individuals upon whom eligibility for the 8(a) BD program was based relinquished or enters into any agreement to relinquish ownership or control of the Participant such that the Participant would no longer be controlled or at least 51% owned by disadvantaged individuals.

13 C.F.R. § 124.515(a)(1)(i). When there is a change in either ownership or control, the only legal way that the contractor may continue to perform under the 8(a) contract is to inform SBA of the change and seek and obtain a waiver in writing prior to the change. 13 C.F.R. § 124.515(b)-(d).

---

[2] The SBA promulgated regulations for the 8(a) program several times during the period covered by this suit. The substance of the 8(a) program regulations GAIC and NASCO violated were in effect as of 2012 and through the entire period covered by this action.

## II. Factual Background

The FAC alleges the following facts, which the Court must accept as true for the purpose of assessing their sufficiency under Rule 12(b)(6).

Dennie Gose, a disabled Vietnam War veteran, founded and served as CEO of DWG, an architecture and construction business. FAC ¶¶ 18, 67-68. In 2004, DWG was admitted into the 8(a) program based on Gose's disadvantaged status. *Id.* ¶¶ 69-70, 73. Thereafter, DWG successfully bid on and was awarded a series of 8(a) set-aside IDIQ multiple award contracts for construction and building design. *Id.* ¶ 70.

While DWG held those contracts, it was eligible to compete among a small pool of 8(a) businesses pre-approved for future "task orders" for defined services. GAIC wrote surety bonds for DWG's successful task orders, potentially putting itself on the hook for millions of dollars if DWG defaulted on its obligations. *Id.* ¶¶ 71, 74. In exchange, Gose, Relator Berry, and their spouses entered into an indemnity agreement with GAIC, putting up their personal assets (such as their homes) as collateral for those bonds. *Id.* ¶ 71.

Because of DWG's success in winning 8(a) contracts, however, by early 2010 it outgrew the 8(a) program's size limits and therefore "graduated." *Id.* ¶ 72. While DWG's growth meant it was no longer eligible to bid on new 8(a) set-aside multiple award contracts, 8(a) Program rules allowed DWG to continue to bid on individual task orders for under the contracts it had previously been awarded—but only if Gose retained both 51% unconditional ownership, and also control, of DWG. *Id.*

DWG's financial situation deteriorated after it graduated from the 8(a) program, and by June 2012 it was in danger of defaulting on its existing 8(a) task order contracts. *Id.* ¶ 75. If DWG had defaulted, GAIC would have been on the hook for tens of millions of dollars in uncompleted projects. *Id.* ¶ 82. And through their indemnity agreements, Gose, Berry, and their spouses were at risk of financial ruin, including the loss of their homes. *Id.* After DWG disclosed the risk to GAIC, "GAIC froze DWG's bonding program and refused to issue further bonds without third-party indemnification of GAIC." *Id.* ¶ 79.

At this point, NASCO entered the picture. *Id.* ¶¶ 76, 83. NASCO submitted a proposal to DWG to assist with completing DWG's backlog of already-awarded 8(a) task orders and offered to partner with DWG on future 8(a) task orders as well. *Id.* ¶ 87. By early August 2012, GAIC had stepped in, ordered DWG to stop negotiations with all other potential partners, and took control of the negotiations with NASCO. *Id.* ¶ 103.

Thereafter, GAIC and NASCO forced Gose out of the picture. Specifically, they conspired to use their extreme financial leverage over Gose to force him into several agreements that led, by no later than November 15, 2012, to Gose's loss of both 51% unconditional ownership, and also control, of DWG. *Id.* ¶¶ 89-199. Gose had no real choice but to sign these agreements because DWG was dependent on GAIC for surety bonds and on NASCO to indemnify those bonds, and NASCO and GAIC "knew that threatening to withdraw NASCO's indemnification of DWG's bonds would force

DWG to comply with its instructions and strip Dennie Gose of the ability to control DWG." *Id.* ¶ 223. During this process, Relator Berry and DWG's attorney warned NASCO and GAIC that these agreements "potentially violated SBA regulations requiring control by Dennie Gose as the economically and socially disadvantaged individual upon whom DWG's 8(a) eligibility depended." *Id.* ¶ 137; *see also id.* ¶¶ 105, 225-26. Undeterred, NASCO and GAIC pressed forward with the agreements. *Id.* ¶ 227.

With the agreements in place, NASCO took control of DWG's day-to-day operations and its long-term strategy, including deciding which task orders to bid on. *Id.* ¶¶ 164-99. To that end, NASCO "implement[ed] a new process for considering bids on task orders under DWG's multiple award contracts," i.e., the process for obtaining new 8(a) projects, in DWG's name, from which GAIC and NASCO would benefit. *Id.* ¶ 108. NASCO knew that it was required to notify SBA of DWG's change in ownership and control, and despite assuring Gose and Berry that it was in contact with the SBA, it never sought or received any assurances from the SBA that its agreements would not affect DWG's eligibility to bid on or perform task orders under DWG's 8(a) contracts. *Id.* ¶ 228. Indeed, NASCO—an experienced government contractor and itself a former 8(a) participant—clearly knew the rules, because it "expressly incorporated SBA rules" into at least one of the agreements that stripped Gose of unconditional ownership of DWG. *Id.* ¶ 230. Nevertheless, NASCO and GAIC made an affirmative decision not

to seek a waiver, or otherwise inform SBA, of DWG's change in ownership and control. *Id.* ¶¶ 200-06, 222-37.

Because the agreements divested Gose of 51% unconditional ownership and control of DWG, DWG's 8(a) contracts were subject to mandatory, nondiscretionary termination. *Id.* ¶¶ 200-04. This, in turn, excluded DWG from consideration for future task orders under those contracts. *Id.* But because Defendants never notified the government of the change in ownership and control, the contracts were not terminated. *Id.* ¶ 205. Instead, GAIC and NASCO caused DWG to fraudulently bid on new task orders under DWG's 8(a) contracts in DWG's name. *Id.* ¶¶ 207-21. The government, unaware of the change in ownership and control, awarded DWG dozens of additional task orders. *Id.* ¶ 208. GAIC and NASCO received 100% of the payments from these task orders—tens of millions of dollars that should have gone to businesses that were actually 8(a) eligible. *Id.* ¶¶ 207-10. While relator Gose retained a nominal title and salary with DWG, GAIC and NASCO cut him out of all decision-making and access to financial or contract information, and Gose received no share of the profits from those fraudulently obtained task orders. *Id.* ¶¶ 172, 194, 220.

## III.     Procedural History

Gose and Berry brought this action as relators under the FCA to recover for the government the funds obtained from the government by GAIC and NASCO after

Gose lost ownership and control of DWG and GAIC and NASCO continued to illicitly bid on task orders under DWG's 8(a) contracts.[3]

The FAC pleads six counts: one count each against GAIC and NASCO for violating 31 U.S.C. § 3729(a)(1)(A) by knowingly making or presenting, or causing to be made or presented, bids for task orders by DWG that they knew DWG was not eligible to receive because of its change of ownership and control (the false claims causes of action); one count each against GAIC and NASCO for violating 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used false records or statements material to getting false claims paid (the false statement causes of action); and one count each against GAIC and NASCO for conspiring to submit bids through DWG which they knew DWG was not eligible for, in violation of 31 U.S.C. § 3729(a)(1)(C) (the conspiracy claims).

GAIC and NASCO moved to dismiss the FAC, and Relators opposed. The District Court granted the motions and dismissed the FAC with prejudice. D.E. 94. It ruled that the FAC failed to establish falsity for two reasons. First, it concluded that there was no need to seek a waiver to prevent the termination of DWG's IDIQ contracts and continue bidding on individual task orders because DWG had graduated from the 8(a) program by the time the agreements between GAIC, NASCO, and DWG went into place, and DWG was thus not a "Participant" and not subject to the loss-of-

---

[3] Sean Gose is participating in this case as personal representative of the estate of Dennie Gose, who passed away after the case was commenced. D.E. 36.

control rule or mandatory termination. *Id.* at 11-14. Second, it ruled that the agreements between GAIC, NASCO, and DWG did not divest Gose of 51% unconditional ownership. *Id.* at 14-17.

The District Court also ruled that the FAC failed to allege submission of a false claim (what it termed a "presentment" element) because "[f]raudulent inducement with regard to bidding on a government contract, as distinguished from submitting a claim for payment under the contract, is not available as a cause of action under the FCA." *Id.* at 17-19. It further found that the FAC's claims did not meet Rule 9(b)'s particularity standard. *Id.* at 19.

Finally, the District Court ruled that the FAC's conspiracy claims failed because the underlying FCA claims failed, and because the FAC failed to "identify with particularity any agreement that was made to defraud the United States regarding task orders, when it was made, and who actually made it." *Id.* at 22.

Relators moved for reconsideration of the District Court's dismissal order. D.E. 95. At that stage, the government filed a Statement of Interest expressing the view that the District Court erred in ruling that the provisions relating to a change of ownership or control cease to apply after a company "graduates" from the 8(a) program, and in ruling that fraudulent inducement is not actionable under the FCA. *See* D.E. 102. The District Court denied the motion for reconsideration. D.E. 104. Relators timely appealed. D.E. 105.

# LEGAL STANDARD

This Court "review[s] de novo a district court's grant of a motion to dismiss under Rule 12(b)(6), accepting the complaint's well pleaded factual allegations as true and construing them in the light most favorable to the plaintiff." *Morfa Diaz v. Mayorkas*, 43 F.4th 1198, 1202 (11th Cir. 2022). To satisfy Federal Rule of Civil Procedure 8, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

A complaint under the FCA must meet the heightened pleading standard of Rule 9(b), *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009), which states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The complaint "satisfies Rule 9(b) if it sets forth facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* (internal quotation marks omitted).

## SUMMARY OF THE ARGUMENT

**I.** The FAC establishes both false statements and false claims, in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B).

**I.A.** The District Court erred in concluding that the term "Participant" in 13 C.F.R. § 124.515(a)(1) excludes graduated entities. To ensure that the benefits of 8(a) contracts flow to the socially and economically disadvantaged individuals who received them in the first place, Congress intended for the ownership and control requirements

to run for the life of the contract, regardless of whether the contractor graduates during the course of its performance. Accordingly, the plain language of 13 C.F.R. § 124.515(a)(1) and the statute it implements, their context, the statute's legislative history, and the regulation's history all make clear that when the owner or owners upon whom the company's eligibility for the 8(a) program was based relinquish ownership or control of that business, the 8(a) contracts awarded to the business are automatically terminated, regardless of whether it has "graduated" from the 8(a) program by losing its status as a small business at the time of the change in ownership and/or control.

Thus, the term "Participant" necessarily includes both graduated and nongraduated businesses. Moreover, the District Court's interpretation of the word "Participant" violates the canon against surplusage, because the waiver provision for graduated concerns in Subsection (b) of § 124.515 would be unnecessary and meaningless under the District Court's construction.

**I.B.** The District Court further erred by ruling that dismissal was warranted based solely on its conclusion that the FAC failed to sufficiently plead that Dennie Gose relinquished unconditional ownership of DWG.

Even if the FAC's allegations concerning Gose's loss of unconditional ownership were insufficient, that is not enough to warrant dismissal because DWG was ineligible to bid on task orders under its 8(a) contracts unless Gose maintained unconditional ownership *and* control of DWG. The District Court made no finding that the FAC's allegations concerning Gose's control were insufficient—it did not address those

allegations at all. Further, the FAC plausibly alleged that Gose relinquished unconditional 51% ownership of DWG.

**I.C.** The United States Supreme Court, this Court, seven circuits, and many district courts have either expressly recognized or strongly indicated that the FCA covers a fraudulent-inducement theory of liability based on submission of false bids. These courts hold that when a defendant obtains a government contract or task order under false pretenses, that falsity in turn renders every subsequent claim for payment false, even if the claims themselves do not contain direct misrepresentations. Moreover, the Supreme Court has made clear that the FCA is a remedial statute that must be broadly interpreted to include any kind of fraud that results in the improper payment of government funds.

Thus, the District Court's rulings that "[f]raudulent inducement with regard to bidding on a government contract . . . is not available as a cause of action under the FCA," D.E. 94 at 18-19, or that fraudulent inducement is only actionable if, in some undefined way, the "falsity extends to a claim for payment," D.E. 104 at 5, are at odds with decisions across the country and at every level of the federal court system, and it directly contradicts the FCA's goal to broadly protect government funds from fraudulent claims.

**I.D.** The District Court further erred by ruling that the FAC's falsity allegations failed to satisfy Rule 9(b)'s particularity requirement. Rule 9(b)'s purpose is to alert defendants to the precise misconduct with which they are charged and protect them

against spurious charges of immoral and fraudulent behavior. Thus, when allegations in a complaint are detailed enough to give a defendant notice of the specific claims of fraud against it and allow it to prepare a defense against those claims, the allegations are sufficient.

The FAC's allegations easily satisfy these requirements. The FAC identifies the 8(a) contracts subject to termination once Gose lost ownership and control, a sample of the task orders subsequently awarded as a result of GAIC and NASCO's false bids, and the specific award key, the place of performance, the date of the award, and the number of offers. These specifics give GAIC and NASCO more than enough information to put them on notice of the specific claims against them and allow them to prepare a defense.

**II.** The FAC sufficiently pled the existence of an FCA conspiracy between GAIC and NASCO. It alleges that, through a series of email and phone communications and in-person meetings in Cincinnati in August and September 2012, GAIC and NASCO formed a conspiratorial agreement to seize ownership and control of DWG, and it incorporates an agreement that reduced the conspiracy to writing as an exhibit. This is enough to state conspiracy claims. Further, because the FAC establishes actionable falsity under the FCA, the District Court's dismissal of the conspiracy claims for failing to establish the "existence of a false claim," D.E. 94 at 22, was incorrect.

# ARGUMENT

The FAC asserts claims under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B). Section 3729(a)(1)(A) imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," and Section 3729(a)(1)(B) imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

These two provisions share the same elements: "the existence of a false claim or statement, the materiality of that false claim or statement, and scienter." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1298 (11th Cir. 2021); *see also Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (summarizing the elements as "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due") (internal quotation marks omitted).

In its order dismissing the FAC, the District Court did not address (and GAIC and NASCO did not challenge) the FAC's allegations concerning the scienter, materiality, or causation elements. Instead, it ruled that all the FAC's claims failed because the FAC did not allege a false statement or claim for payment. *See, e.g.*, D.E. 94 at 20, 21. It also ruled that the FAC failed to plead conspiracy allegations with particularity. *Id.* at 22-23. These rulings were incorrect.

# I.      The FAC pled actionable falsity with ample particularity.

Relators' false claim and false statement causes of action are both premised on the same theory: GAIC and NASCO caused DWG to bid on task orders under DWG's 8(a) contracts while knowing and without disclosing that Gose was divested of control and 51% unconditional ownership of DWG, which resulted in automatic termination of DWG's 8(a) contracts. The bids were false statements because they indicated to the government that DWG was eligible to perform under the 8(a) contracts when it wasn't, and they fraudulently induced the government to award the task orders, thereby rendering the subsequent claims for payment false. These allegations established the falsity element for all six of the FAC's causes of action.

The District Court offered four grounds for its ruling that the FAC failed to allege falsity (two of which it classified as going to the "presentment" element but, as discussed below, in fact go to falsity). First, it found that the term "Participant," as that term is used in the above-discussed SBA regulations governing the 8(a) program, does not include an entity that has "graduated" from the 8(a) program by outgrowing its status as a small business, and thus that the ownership and control requirements of the 8(a) program no longer applied to DWG when the events at issue in this case occurred. D.E. 94 at 12-15.

Second, the District Court ruled that the FAC failed to allege a change in ownership. Although the Court made no such holding as to change in control, it nonetheless seemed to be of the (incorrect) view that a failure to allege a change in

ownership was independently sufficient to require dismissal. D.E. 94 at 15-17.

Third, the District Court examined the FAC's fraudulent-inducement theory of liability and ruled that "[a] fraudulent inducement claim is cognizable under the FCA—satisfies § 3729(a)(1)(A)—only where the alleged falsity extends to a claim for payment." D.E. 104 at 5. It did so in an analysis of what it called the "presentment" element of a claim under 31 U.S.C. § 3729(a)(1)(A), rather than the falsity element. D.E. 94 at 17. However, this confusing distinction between falsity and "presentment" is unnecessary in this case—there is no dispute that DWG presented claims for payment to the government. The dispute is simply whether those claims were false. Accordingly, Relators address the District Court's analysis of the fraudulent-inducement theory here in this Brief's discussion of falsity.

Fourth, in its discussion of what it called the "presentment" element, the District Court ruled that "[e]ven if Relators had alleged an actionable fraud, their claims fail under the particularity standards of Rule 9(b)." *Id.* at 19.

The District Court erred in reaching each one of these conclusions.

## A. The District Court erred in concluding that the term "Participant" excludes graduated entities.

The 8(a) Program's regulations require that an "applicant or Participant" be controlled and 51% unconditionally owned by a socially and economically disadvantaged individual. *See* 13 C.F.R. §§ 124.105, 124.106. The key regulation at issue in this case further requires that, absent a waiver, 8(a) contracts

must be terminated for the convenience of the Government if . . . [o]ne or more of the individuals upon whom eligibility for the 8(a) BD program was based relinquishes or enters into any agreement to relinquish ownership or control of the Participant such that the Participant would no longer be controlled or at least 51% owned by disadvantaged individuals.

13 C.F.R. § 124.515(a)(1) (emphasis added).[4] SBA has authority to grant a waiver of mandatory termination, but any waiver must be requested "in writing prior to the change of ownership and control except in the case of death or incapacity." *Id.* § 124.515(c). And a waiver may only be granted for one of five expressly enumerated reasons. *Id.* § 124.515(b).

This regulation flows from, and is a direct implementation of, the statute that authorized the 8(a) program. The statute requires that 8(a) contracts "shall be performed by the concern that initially received such contract" and that "if the owner or owners upon whom eligibility was based relinquish ownership or control of such concern, or enter into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government." 15 U.S.C. § 637(a)(21)(A).

The District Court, in ruling that the FAC failed to allege "falsity," ignored both

---

[4] The FAC cited the 2011 version of this regulation and related regulations discussed here. *See* FAC ¶¶ 37-42. In the District Court, NASCO argued that the relevant version of the regulation is the one in effect at the time DWG entered into the 8(a) IDIQ contracts. Even assuming that to be correct, the versions in effect at the time of the contracts are substantively the same as the versions cited in the FAC, and they continue to be substantively the same today. This Brief accordingly cites the current versions of these regulations.

this regulation and the underlying statutory provision. It concluded that, "[a]fter 2010, DWG was no longer a small business, and it was no longer admitted to the program," and thus "it was no longer a Participant." D.E. 94 at 13. Having concluded that DWG was not a "Participant" during the relevant time-frame, it held that "the control requirements of § 124.106(a)(1) did not apply to DWG." *Id.* at 14. Although the District Court did not say so explicitly, the necessary implication of that reasoning is that 13 C.F.R. § 124.515(a)(1) did not apply to DWG in 2012 because, by then, DWG had already "graduated" from the 8(a) Program.

In other words, that portion of the court's ruling on "falsity" hinged on its reading of the term "Participant." That reading, however, was incorrect, and it is incompatible with the plain meaning of both 13 C.F.R. § 124.515 and 15 U.S.C. § 637(a)(21)(A).

The first step in regulatory analysis is to consider whether a regulation has a "plain and unambiguous meaning," determined "by referring to the language itself, the specific context in which that language is used, and the broader context of the [regulations] as a whole." *Sec. & Exch. Comm'n v. Levin*, 849 F.3d 995, 1003 (11th Cir. 2017). The language and context of 13 C.F.R. § 124.515 make clear that the word "Participant" must include graduated concerns like DWG. The first provision of the mandatory termination regulation requires that 8(a) contracts "be performed by the Participant that initially received it unless a waiver is granted." That language assumes that an entity that is awarded an 8(a) contract, and is performing it, is a "Participant."

Indeed, if, as the District Court held, a concern ceases to be a "Participant" the moment it graduates from the 8(a) program, then how could it comply with this provision if it is still bound by a previously awarded 8(a) contract? Nothing in the SBA regulations suggest that a concern that graduates must immediately cease performance under previously-awarded 8(a) contracts; indeed, the regulations say the exact opposite, making clear that a concern that graduates may continue to perform previously awarded 8(a) contracts.[5] *See* 13 C.F.R. §§ 124.501(g), 124.503(h).

Further, "courts should avoid rendering other provisions of a regulation superfluous or inoperative." *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1245 (11th Cir. 2008). Subsection (b) of § 124.515 sets forth the bases on which SBA may grant a waiver. The fifth basis for a waiver applies "only if [t]he concern has graduated from the 8(a) BD program." 13 C.F.R. § 124.515(b)(5)(i). This fifth basis for waiver would be superfluous if a graduated entity is not a "Participant" and cannot have its contracts terminated under subsection (a)(1). If graduated concerns are not subject to that termination requirement, they would have no need to seek a waiver under

---

[5] The "size" of business is typically determined based on the amount of revenue the business generates. Thus, a business that is "small" at the time it bids on a set-aside contract may outgrow a size limitation, and thus become other than small, simply by virtue of having been awarded the very contract for which it was eligible based on its prior "small" size. And, indeed, one purpose of set-aside contracting is to encourage the growth of small businesses. Thus, for a "small" business to be awarded a set-aside contract, and to then outgrow the size limitation while it is performing that contract, is a common occurrence, and one that is intended by the various small business set-aside programs such as the 8(a) program. FAC ¶ 4.

subsection (b)(5). The fifth basis for waiver proves that, as a matter of plain meaning, a graduated entity that is still performing a previously awarded 8(a) contract is indeed still a "Participant."

Context from other parts of SBA's 8(a) regulations similarly demonstrate that "Participant" does not mean only a non-graduated 8(a) concern. For example, 13 C.F.R. § 124.304(f) states that "[a]fter the effective date of early graduation or termination, a Participant is no longer eligible to receive any 8(a) BD program assistance. However, such concern is obligated to complete previously awarded 8(a) contracts, including any priced options which may be exercised." There, the term "Participant" is, yet again, used to refer expressly to a graduated concern.

The District Court's ruling that graduated entities are no longer bound by the ownership and control requirements also runs contrary to 13 C.F.R. § 124.507(d). That regulation states that an entity that graduates from the 8(a) program is still eligible to be awarded an 8(a) contract if the date of the entity's bid on the 8(a) contract was before the date of the entity's graduation, but only "if it continues to meet all other applicable eligibility criteria." The eligibility criteria—indeed the most important ones—involve continued ownership and control of the entity by the qualifying disadvantaged individual.

The District Court's reading of the term "Participant" also creates an unnecessary conflict between the regulation and its organic statute. When a regulation implements a statute, the regulation "must be construed in light of the statute." *United*

*States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004). Here, the termination provision of 13 C.F.R. § 124.515 flows directly from the statute authorizing the 8(a) program, which as previously noted requires that 8(a) contracts "shall be performed by the *concern* that initially received such contract" and that "if the owner or owners upon whom eligibility was based relinquish ownership or control of such *concern*, or enter into any agreement to relinquish such ownership or control, such contract or option shall be terminated for the convenience of the Government." 15 U.S.C. § 637(a)(21)(A) (emphases added).

The statute thus focuses on the concern's continued control and 51% unconditional ownership by the individual who qualified for 8(a) program assistance, with no distinction between non-graduated and graduated 8(a) contract holders. And like the implementing regulation, the statute also includes a waiver of the mandatory termination requirement that applies only if "such concern has exited"—*i.e.*, graduated from—the 8(a) program. 15 U.S.C. § 637(a)(21)(B)(v)(I).[6] Congress thus expressed its intent for this provision to apply throughout the life of 8(a) contracts, to ensure that their benefits flow to the socially and economically disadvantaged individuals who originally received them.

As the government's Statement of Interest thoroughly detailed, *see* D.E. 102 at 3-5, the Small Business Act's legislative history confirms this interpretation. For example, the House Committee on Small Business warned that its members had been

---

[6] This provision of the statute refers to the 8(a) program by its prior name, the "Capital Ownership Development Program."

informed that "at least on seven past occasions section 8(a) firms have sold out to large non-disadvantaged businesses immediately after or near the expiration of their fixed program participation terms" (in other words, their graduation dates). H.R. Rep. No. 100-460, at 35 (1987). The Committee noted when such a practice happens, "[t]he new owners receive the benefits of all 8(a) contracts and contract options, valued at tens of millions of dollars, held at the time of sale and, to make matters worse, the performance of those contracts and options is still recorded as contract award dollars to disadvantaged businesses." *Id.* These "graduation gifts" make such businesses "attractive takeover targets when they emerge from the program." *Id.*

Likewise, the regulation's history further shows that SBA followed Congress's directives. When SBA first implemented the mandatory termination regulation, it was titled "Performance of contracts by original 8(a) concern," and its text essentially mirrored the statutory language referenced above. *See* 13 C.F.R. § 124.317 (1989). The 1989 Federal Register notice adopting the regulation stated that the language was "taken directly from [the statute] and implements the requirement that a contract be performed by the 8(a) firm that initially received the contract award." Minority Small Business and Capital Ownership Development Program, 54 Fed. Reg. 34,692, 34,709 (Aug. 21, 1989). There was no suggestion that the requirement was limited to non-graduated 8(a) concerns. *See id.* SBA instead recognized that the statute was focused on the socially and economically disadvantaged individual retaining ownership and control of that concern. *See id.*

Although in 1998 SBA made cosmetic changes to the mandatory termination regulation as part of SBA's "attempt[] to rewrite the regulations in plain English wherever possible" for "ease of use," those changes were not substantive. *See* Small Business Size Regulations, 63 Fed. Reg. 35,726, 35,727 (June 30, 1998). Thus, the mandatory termination regulation's heading changed from "Performance of contracts by original 8(a) concern" to "Can a Participant change its ownership or control and continue to perform an 8(a) contract, and can it transfer performance to another firm?" Although SBA commented on changes to the mandatory termination requirement in its proposed rulemaking, it did not suggest that the change from "concern" to "Participant" intended any substantive change from the statutorily derived language implemented in 1989. *See* Small Business Size Regulations, 62 Fed. Reg. 43,584 at 43,594 (proposed Aug. 14, 1997).

Still further, SBA's *Standard Operating Procedure for the Office of Business Development* makes clear that SBA considers contracts held by graduated concerns to be subject to the mandatory termination provision. Chapter 10 of the document is titled "Leaving the 8(a) Program," and Section 2 of that chapter is titled "What Happens After a Participant Leaves the Program?" The language of that section repeatedly uses the word "Participant" to refer to graduated concerns. Specifically, it states: "When *Participants* with current 8(a) contracts go out of business or when the individuals upon whom eligibility is based cease to own and control *the Participant*, those 8(a) contracts must be terminated unless the SBA Administrator grants a waiver." *See* U.S. Small Bus. Admin.,

*Standard Operating Procedure for the Office of Business Development* 241 (2016), https://www.sba.gov/sites/default/files/sops/SOP_80_05_5_.pdf (emphases added).

Finally, as the government detailed in its Statement of Interest, *see* D.E. 102 at 5-6, parallel provisions of the Federal Acquisition Regulations ("FAR"), which codify and publish "uniform policies and procedures for acquisition by all executive agencies," 48 C.F.R. § 1.101, contain provisions that emphasize the essential nature of these requirements, and that again make clear that the termination provision applies to graduated entities. For example, without making any reference to "Participants," 48 C.F.R. § 19.812(d) provides that "[a]n 8(a) contract . . . must be terminated for convenience if the 8(a) concern to which it was awarded transfers ownership or control of the firm . . . unless the [SBA] waives the requirement for contract termination." (citing 13 C.F.R. § 124.515). The FAR also states, again without reference to "Participants," that "a waiver of the requirement for termination is permitted only if the 8(a) firm's request for waiver is made to SBA prior to the actual relinquishment of ownership or control, except in the case of death or incapacity." *Id.*

All these sources compel a single conclusion: "Participant" includes both non-graduated and graduated concerns. The fundamental rules of the 8(a) Program regarding control and 51% unconditional ownership continued to apply to DWG's 8(a) contracts throughout their lives.

The District Court cited and relied upon three decisions from the SBA Office of Hearings and Appeals, D.E. 94 at 13-14, but those decisions did not address the question presented here.

*Size Appeal of: FTSI-Phelps Jv, Appellant*, SBA No. SIZ-5583, 2014 WL 4804769 (Aug. 19, 2014), has nothing to do with the issue presented here. There, the question was whether an entity that had graduated from the 8(a) program could bid on a *new* 8(a) contract. *Id.* at *8. The case did not address what happens to an *existing* contract when an entity graduates, and nothing in the decision supports the District Court's reading of "Participant."

*In re Reality Technologies, Inc.*, SBA No. BDP-455, 2012 WL 8134444 (Nov. 21, 2012), is similarly inapposite. The District Court cited a footnote in that opinion describing one of the companies involved in the underlying fact pattern this way: "CounterTrade Products, Inc ('CounterTrade') is a former participant in, and graduate of, the 8(a) program. As a result, CounterTrade is considered a non-disadvantaged firm." *Id.* at n. 2. That statement is certainly true: an entity that is *both* a "former participant" *and* a "graduate" of the 8(a) is treated as non-disadvantaged. But note that, in this quote, "former participant" and "graduate" are treated as two separate conditions, *not* as identical. And nothing in *Reality Techs.* addresses whether an entity that has graduated, but is still performing under an 8(a) contract, is or is not a "Participant," or otherwise exempt from 13 C.F.R. § 124.515(a).

Finally, *In re David's Custom Roofing & Painting, Inc.*, SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010), a 1-page order dismissing an appeal as moot, similarly fails to shed any light on the issue presented here.  The discussion section of the order is a mere two sentences:

> On March 8, 2010, the SBA moved to dismiss the appeal as moot because Petitioner's nine-year program term expired on February 26, 2010. SBA stated, since Petitioner is no longer an 8(a) BD program participant, a decision by the Office of Hearings and Appeals regarding SBA's determination to graduate Petitioner from the 8(a) BD program early will have no effect on Petitioner's status.

It is evident from these two sentences that the Petitioner had graduated and was no longer a participant. Again, these two conditions are stated as *separate*, not as identical. And the order does not indicate whether the petitioner had ongoing 8(a) contracts. If the Petitioner did *not* have ongoing 8(a) contracts, and had graduated, then the Petitioner indeed was no longer a "participant," and this is the mostly likely explanation for the SBA's position in that case. Either way, the case does not address the question here.

By contrast, the governing statute and regulation *do* address and answer the question here: a "Participant" means both graduated and nongraduated 8(a) program participants.

> **B.    The FAC pled facts making it more than plausible that Dennie Gose relinquished unconditional ownership of DWG, but even if it didn't, the FAC established that Gose relinquished *control* of DWG.**

For two reasons, the District Court's holding that the FAC was "due to be

dismissed" because it failed to allege the agreements "destroy[ed] Gose's unconditional ownership," D.E. 94 at 17, is also wrong.

First, even assuming for sake of argument that the District Court's analysis pertaining to Gose's ownership of DWG was correct, that analysis would not, standing alone, provide grounds for dismissal. 13 C.F.R. § 124.515(a) applies to a change in ownership *or* a change in control—either one is sufficient to trigger termination of the contract, *see, e.g.*, *Scollick ex rel. United States v. Narula*, No. 1:14-CV-01339-RCL, 2022 WL 3020936, at *8 (D.D.C. July 29, 2022) (considering 51% unconditional ownership requirement and control requirement separately)—and the District Court did not rule that the FAC's allegations concerning divestiture of Gose's *control* of DWG were insufficient (it simply did not address them at all).

Indeed, the FAC plausibly alleged that Gose relinquished control of DWG no later than November 15, 2012. FAC ¶¶ 83-191. Control is a holistic question that includes "both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations." 13 C.F.R. § 124.106. A non-disadvantaged individual or entity controls a business when they "[e]xercise actual control or have the power to control the" business, when they "[r]eceive compensation . . . that exceeds the compensation to be received by the highest officer," or where "[b]usiness relationships exist with non-disadvantaged individuals or entities which cause such dependence that the applicant or Participant cannot exercise independent business judgment without great economic risk." *Id.* § 124.106(e), (g).

The FAC alleges these hallmarks of control by non-disadvantaged individuals. Accepting the allegations as true, by no later than November 15, 2012, NASCO and GAIC exercised almost complete control over DWG, and Gose had been shut out of all significant decision-making and access to financial and contractual information. FAC ¶¶ 104-15; 123-25; 139-91. Gose lost control (or even influence) over DWG's board of directors. *Id.* ¶ 174. Gose's salary of $125,000 was less than at least two other non-disadvantaged individuals at the company, who made $140,000 and $170,000. *Id.* ¶ 172. And DWG and Gose depended so heavily on GAIC and NASCO that DWG and Gose lost the ability to exercise independent business judgment without the risk of financial ruin. *Id.* ¶¶ 78-82, 86, 106-07, 139, 149-60; *see also id.* ¶¶ 8, 14, 141, 197 (assigning away 100% of 8(a) contract revenues). Thus, after November 15, 2012, Gose cannot be said to have exercised "control" over DWG under even the loosest definition of the term. Accordingly, even if correct, the District Court's holding that the FAC failed to allege a change in unconditional ownership would not support dismissal.

Second, the FAC pled sufficient facts to establish that Gose relinquished unconditional ownership of DWG no later than November 15, 2012. FAC ¶¶ 192-99; 13 C.F.R. § 124.105(d); *see also* 15 U.S.C. § 637(a)(4)(A)(i). For purposes of the 8(a) program, unconditional ownership requires far more than formal, paper ownership. To be unconditional, ownership must not be "subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits

to go to another (other than after death or incapacity)." 13 C.F.R. § 124.3. Further, "*any* unexercised stock options or similar agreements . . . held by non-disadvantaged individuals will be treated as exercised," apart from one express exception not relevant here. 13 C.F.R. § 124.105(e) (emphasis added).

SBA's use of "any" means "all" unexercised options are treated as exercised, other than the expressly enumerated exception. *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001) (citing cases explaining that the word "any" is not ambiguous and means "all"). In addition, to be "unconditional," ownership must entitle the disadvantaged owner "to receive at least 51 percent of the annual distribution of dividends paid on the stock" of the 8(a) business, and "at least 51 percent of the retained earnings of the concern." 13 C.F.R. § 124.105(f).

And 13 C.F.R. §§ 124.3 and 124.105 make clear that *all* the above conditions must be satisfied for ownership to be considered "unconditional." Thus, if even one of those conditions was not met, then Gose lost unconditional ownership of DWG. The allegations of the FAC support this conclusion for at least three reasons.

First, Gose lost unconditional ownership of DWG no later than November 15, 2012 when he signed the "Right of First Refusal and Option Agreement" ("Option Agreement"). FAC ¶ 192; *id.* Exhibit K. That Option Agreement gave NASCO an unexercised option to purchase all of Gose's shares (through a right of first refusal), and by the plain language of the regulations, that unexercised option is considered exercised when determining ownership. 13 C.F.R. § 124.105(e). Thus, Gose lost his

36

unconditional ownership of DWG when he signed the Option Agreement.[7]

Second, the Option Agreement also deprived Gose of unconditional ownership because it restricted his right to sell his interest in the company in two other ways: it restricted his ability to sell less than all of his stock, and it restricted Gose from selling his shares to the buyer of his choosing. FAC ¶ 193-94; *id.* Exhibit K at § 3.2c. (noting that Gose was only allowed to "consider and accept a bona fide offer from a third party to purchase all and not less than all of Gose's shares of DWG" and giving NASCO the right to match any offer). These restrictions on Gose's ownership made it conditional rather than unconditional.

Third, Gose also lost unconditional ownership because the Final MAS Agreement assigned away 100% of DWG's revenue—98% to NASCO and 2% to GAIC—even though SBA regulations required that he have the right to 51% of the

---

[7] The District Court's reliance on *Veterans Contracting Group, Inc. v. United States*, 133 Fed. Cl. 613 (Fed. Cl. 2017), and *Miles Construction, LLC v. United States*, 108 Fed. Cl. 792, 795 (Fed. Cl. 2013), was also misplaced. To the extent *Veterans Contracting Group* has any bearing on this case, it supports *Relators* because the court there faulted an SBA area office for adopting an interpretation of the "unconditional ownership" requirement that failed to take 13 C.F.R. § 124.105(e)—a crucial provision at issue there and here—into account. *See* 133 Fed. Cl. at 622-23 ("Notably, 13 C.F.R. § 124.105(e) states that 'SBA will disregard any unexercised stock options or similar agreements held by disadvantaged individuals' in determining whether an applicant unconditionally owns the company at issue. This provision, which was not addressed by the SBA area office, directly bears on Veterans' shareholder agreement and its status as a SDVOSB."). And *Miles Construction* did not address the effect of Section 124.105(e) on the unconditional-ownership analysis because it analyzed the agency decision at issue under Veterans Administration regulations to which Section 124.105(e) (which is specific to the 8(a) program) does not apply.

annual dividends and retained earnings. FAC ¶¶ 8, 14, 141, 197; *id.* Exhibit I at 11, Part B § 2. The Final MAS Agreement ensured that there would never be any dividends or retained earnings because it entitled NASCO and GAIC to all the revenues from DWG's contracts. It thus effectively deprived Gose of any right to share in DWG's financial success (which dividends or retained earnings represent). *See Scollick*, 2022 WL 3020936, at *7 (claim survived summary judgment on issue of 51% unconditional ownership where "potential equity splits or profit sharing" agreements would entitle the person to 25% of the profits at most).

Accordingly, the FAC's allegation were sufficient to show that Gose lost 51% unconditional ownership of DWG.

## C. The fraudulent-inducement theory pled here is actionable under the FCA.

Further, the FAC set forth a fraudulent-inducement theory that is actionable under the FCA. Specifically, the FAC alleges that GAIC and NASCO fraudulently induced the government to pay on DWG's 8(a) contracts by bidding on task orders under those contracts while failing to disclose the change in ownership and control that rendered DWG ineligible to bid on or be awarded the orders. In a fraudulent-inducement case, "FCA liability attaches not because a defendant has submitted any claim for payment that is 'literally false,' but instead because 'the contract under which payment [is] made is procured by fraud.'" *United States v. Strock*, 982 F.3d 51, 60 (2d Cir. 2020) (quoting *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467-68 (5th Cir.

2009)). When someone procures a contract through deceit, the fraud "'taints' every claim subsequently brought under the contract, rendering these claims actionably false." *Id.* (alteration accepted) (quoting *U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).

The District Court ruled that "[f]raudulent inducement with regard to bidding on a government contract, as distinguished from submitting a claim for payment under the contract, is not available as a cause of action under the FCA." D.E. 94 at 18-19. Putting it a different way, the Court stated in its order on Relators' motion for reconsideration that "[a] fraudulent inducement claim is cognizable under the FCA—satisfies § 3729(a)(1)(A)—only where the alleged falsity extends to a claim for payment." D.E. 104 at 5.[8] This reasoning is at odds with decisions across the country—at every level of the federal court system—recognizing that in a fraudulent-inducement case, the lies that deceived the government into awarding a contract render all subsequent claims for payment under that contract false.

To begin, the Supreme Court recognized this type of fraudulent-inducement theory in *Hess*. There, the Court upheld a jury verdict against defendants who obtained

---

[8] In a footnote, the District Court stated that the government "misconstrued" (in its Statement of Interest) the District Court's ruling on fraudulent inducement because the Court "did not hold that fraud in the inducement is not cognizable under the FCA." D.E. 104 at 5 n.1. However, as explained below, the District Court's ruling would effectively preclude fraudulent inducement from being actionable under the FCA, because the requirement that the inducement somehow extend to a claim for payment ignores that the original falsehood which induced the contract renders all subsequent claims for payment under that contract false as well. *See, e.g.*, *Scollick*, 2022 WL 3020936, at *9 (where fraud induced a set-aside contract, "plaintiff-relator need not also prove that the fraud was material to the VA's later *decision to pay*").

government contracts via collusive bidding. *Hess*, 317 U.S. at 542. Like this case, the theory of liability in *Hess* was based on the defendants' failure to disclose disqualifying information while bidding (namely, that the bids were collusive). The Court observed that "[t]he government's money would never have been placed in the joint fund for payment . . . had its agents known the bids were collusive." *Id.* at 543. On these facts, the Court found that each claim submitted under the contracts was a false claim, because the fraud "did not spend itself with the execution of the contract," and it tainted the subsequent requests for payment. *Id.* at 543-44. The contractors' fraudulent bids "and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *Id.*

If *Hess*'s analysis were not clear enough, federal appeals courts and district courts have reaffirmed the viability of this theory of liability under the FCA time and again. *See, e.g.*, *Longhi*, 575 F.3d at 468 ("Under a fraudulent inducement theory, although the Defendants' subsequent claims for payment made under the contract were not literally false, because they derived from the original fraudulent misrepresentation, they, too, became actionable false claims.") (cleaned up); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999) ("Contrary to the district court's decision, in many [fraudulent-inducement] cases[,] the claims that were submitted were not in and of themselves false. . . . False Claims Act liability attached, however, because of the fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder."); *United States v. United Techs. Corp.*, 626 F.3d 313, 320-21 (6th Cir. 2010);

*In re Baycol Prod. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013) ("[W]hen a relator alleges liability under a theory of fraud-in-the inducement, claims for payment subsequently submitted under a contract initially induced by fraud do not have to be false or fraudulent in and of themselves in order to state a cause of action under the FCA.").[9]

For its part, this Court recognized the viability of this theory in *Marsteller for use & benefit of United States v. Tilton*, 880 F.3d 1302 (11th Cir. 2018). There, the Court explained that FCA claims premised on fraudulent inducement "derive from" the Supreme Court's analysis in *Hess*, and that in such cases, "subsequent claims are false 'because of an original fraud (whether a certification or otherwise).'" *Id.* at 1314 (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006)). *Marsteller* then found that the allegations before it "could support multiple theories of fraud in the inducement." *Id.* One of those was an omission theory similar to the one at issue here: the government alleged that "undisclosed conflicts of interest" among the defendants during the negotiation of helicopter purchases for the Army was material to the government's contracting decision. *Id.* at 1315. The Court accordingly remanded the case to the district court to analyze the allegations in light of the Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016).

---

[9] *See also U.S. ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) (same principle); *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902, 904 (9th Cir. 2017) (same principle); *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 421 (D.C. Cir. 2021) (same principle).

Thus, as here, the defendants' alleged fraud in *Marsteller* predated the filing of any claims for payment, but the fraud rendered those claims false.[10]

None of these cases recognize the distinction drawn by the District Court between fraudulent inducement "with regard to bidding on a government contract" and fraudulent inducement that somehow "extends" only to a claim for payment. *See* D.E. 94 at 18-19. It is unclear what it means for the inducement to "extend" to a claim for payment. In any case where a defendant makes a false statement that causes the government to award a contract (or a new task order in the case of an IDIQ contract), "subsequent claims are false because of an *original fraud.*" *Hendow*, 461 F.3d at 1173. In other words, the falsity must "extend" to the claim for payment because it renders that claim false. And to the extent the District Court suggested that the inducement must somehow be contained in the claims themselves, it is hard to see how such a set of facts could ever happen. A contract cannot be induced by claims for payment submitted *after* the contract was awarded.

The overwhelming weight of authority discussed above reflects the principle that "[t]he phrase 'false or fraudulent claim' in the False Claims Act should be construed

---

[10] District courts in this Circuit have likewise recognized this theory of fraudulent inducement as actionable. *See United States ex rel. Marsteller v. Tilton*, No. 5:13-CV-00830-AKK, 2019 WL 4749986, at *8 (N.D. Ala. Sept. 30, 2019) ("*Marsteller II*"); *U.S. ex rel. Sanchez v. Abuabara*, No. 10-61673-CIV, 2012 WL 254764, at *4-5 (S.D. Fla. Jan. 27, 2012); *United States ex rel. Reeves v. Mercer Transportation Co., Inc.*, 253 F. Supp. 3d 1242, 1253 (M.D. Ga. 2017); *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, No. 5:13-CV-2168-LCB, 2020 WL 5408212, at *4 (N.D. Ala. Sept. 9, 2020).

broadly." *Harrison*, 176 F.3d at 787-88. The FCA's purpose compels such a construction. The Supreme Court found it "clear that the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims." *Rainwater v. United States*, 356 U.S. 590, 592 (1958). The FCA is a "remedial statute" that is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). It thus "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 233. Accordingly, courts reject "rigid, restrictive reading[s]" and "narrow" constructions of the FCA. *Id.* at 232, 233.

The District Court ignored this principle, instead adopting the precise type of restrictive FCA interpretation the Supreme Court warned against. It cited 31 U.S.C. § 3729(a)(1)(A)'s reference to presentation of a "false or fraudulent claim for payment" in its conclusion (discussed above) that "a fraudulent inducement claim satisfies § 3729(a)(1)(A) only where the alleged falsity extends to a claim for payment." D.E. 94 at 19. But this ignores that Relator's theory of liability squares perfectly with Section 3729(a)(1)(A)'s plain text: the claim for payment *was* false here because GAIC and NASCO submitted claims for payment they weren't eligible to receive. As this Court explained, in a case of fraudulent inducement, the "original fraud" dictates that "subsequent claims are false." *Marsteller*, 880 F.3d at 1314 (internal quotation marks omitted) (quoting *Hendow*, 461 F.3d at 1173). Here, GAIC and NASCO's bidding on

additional task orders while knowing that DWG's 8(a) contracts were subject to mandatory, nondiscretionary termination invalidated the subsequent claims for payment under those task orders.

*Hess*, *Marsteller*, and a bevy of decisions from across the country compel rejection of the District Court's narrow interpretation of the FCA. Under the FCA, liability may attach "any time a false statement is made in a transaction involving a call on the U.S. fisc." *Harrison*, 176 F.3d at 788. That is the case here: GAIC and NASCO's omissions allowed DWG to win government projects for which it otherwise would not qualify, and the government paid public funds pursuant to those awards that should have gone to legitimate 8(a) businesses. Thus, contrary to the District Court's characterization of this case as an attempt to "use the FCA as an all-purpose antifraud statute," D.E. 94 at 20, this action seeks to hold GAIC and NASCO accountable for a fraudulent course of conduct that "cause[d] the Government to pay out sums of money" to them instead of to legitimate 8(a) businesses—and that is precisely the type of fraud the FCA was designed to, and does, reach. *See Neifert-White Co.*, 390 U.S. at 232-33.

### D. The FAC pled falsity with ample particularity.

The allegations in the FAC also satisfy Rule 9(b)'s particularity requirement. Fed. R. Civ. P. 9(b) requires that a complaint "state with particularity the circumstances constituting fraud." As applied to the FCA, a relator must "allege facts as to time, place, and substance of the defendant's alleged fraud, particularly, the details of the

defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1051 (11th Cir. 2015).

Rule 9(b)'s purpose is to "alert[] defendants to the precise misconduct with which they are charged and protect[] defendants against spurious charges of immoral and fraudulent behavior." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370-71 (11th Cir. 1997) (internal quotation marks omitted). A plaintiff does not need to allege the "precise words used" to further this purpose. *Id.* at 1371.

Moreover, because Rule 9(b)'s particularity requirement must be balanced against Rule 8's requirement of a short and plain statement of the claim, "a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broader policy of notice pleading." *Friedlander v. Nims*, 755 F.2d 810, 813 n.3 (11th Cir. 1985); *see also United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003) (explaining "the simplicity and flexibility contemplated by the rules must be taken into account when reviewing a complaint for 9(b) particularity").

Thus, courts in this Circuit and elsewhere have long understood that allegations satisfy 9(b) as long as they provide the defendant notice of the specific wrongdoing alleged and allow it to prepare a defense. *See, e.g., United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1183 n.11 (9th Cir. 2016) (where a "complaint adequately pleads the circumstances of fraud to satisfy the dual purposes of Rule 9(b)," it is sufficient—regardless of the "particular means" the complaint employs); *Harrison,*

176 F.3d at 784 (stating same principle); *Maderas Del Siglo XXI-Madesi S.R.L. v. Medley Hardwood, Inc.*, No. 13-20508-CIV, 2014 WL 12605558, at *5 (S.D. Fla. Jan. 6, 2014) (stating same principle); *Austin v. Auto Owners Ins. Co.*, No. CIV.A. 12-0345-WS-B, 2012 WL 3101693, at *3 (S.D. Ala. July 30, 2012) (same); *Guarantee Ins. Co. v. Merchants Emp. Benefits, Inc.*, No. CIV A 507-CV-307 CAR, 2008 WL 2559436, at *2 (M.D. Ga. June 23, 2008) (same).

The FAC's allegations easily satisfy these requirements. This is a fraudulent-inducement case in which the deceptive conduct was the *act* of bidding and presenting claims (while failing to disclose that the contracts should have been terminated automatically), not affirmative misrepresentations within the *content* of the bids or claims. Thus, as one court in this Circuit explained, "a finding that all claims under a contract are deemed false or fraudulent by virtue of the contract itself being fraudulently induced suggests that the analysis should instead focus on the particularity of the fraudulent inducement allegations rather than the subsequently filed claims." *Abuabara*, 2012 WL 254764, at *8; *see also Marsteller II*, 2019 WL 4749986, at *8 ("[A] claim alleging fraud in the inducement of a government contract [] focus[es] on the false or fraudulent statements which induced the government to enter into the contract at the outset.") (internal quotation marks omitted); *In re Baycol Prod. Litig.*, 732 F.3d at 877 (stating same principle); *Advanced Concept Innovations, LLC v. Kimberly-Clark Glob. Sales, LLC*, No. 8:21-CV-1493-MSS-CPT, 2021 WL 8084310, at *3 (M.D. Fla. Oct. 29, 2021) (in case alleging fraudulent inducement, holding that Rule 9(b) satisfied where plaintiff "adequately

pleaded the fraudulent representations"). And in such a case, attaching or quoting the bids or claims (which do not contain false content) would not have provided any additional particularity concerning "the circumstances constituting fraud," Fed. R. Civ. P. 9(b), but rather would have added detail for the sake of detail (in contravention of Rule 8's mandate).

As to the circumstances surrounding fraudulent inducement, the FAC contains ample particularity. It states the precise actions and events that made the act of bidding fraudulent. Specifically, it details when and how Gose lost ownership and control of DWG, as well as GAIC and NASCO's involvement in those acts and events, and the precise date (November 15, 2012) after which DWG was ineligible to bid. FAC ¶¶ 83-199, 204. It then identifies many of the specific task orders that GAIC and NASCO caused DWG to fraudulently bid under, along with their award number, award key, place of performance, award date, number of offers, amount paid, and end date. It thus establishes the who, what, where, and when of the fraudulent inducement, which was the act of bidding without disclosing the ineligibility to bid. The FAC did not state the exact dates when GAIC and NASCO submitted all those bids and the exact dates when they submitted claims for payment under the task orders (although it certainly alleges clear timeframes), but GAIC and NASCO cannot claim they lack this information— they clearly know the dates on which they caused DWG to bid, and so do not need to be informed of those dates by Relators.

Further, even if details concerning the bids and claims for payments themselves were required (again, they are not in this fraudulent-inducement case), the allegations concerning those bids and claims nevertheless satisfy Rule 9(b). The FAC's identification of the 8(a) contracts subject to termination once Gose lost control and 51% unconditional ownership, but that GAIC and NASCO continued to bid under in Gose's name, and its listing of the actual task order contracts subsequently awarded as a result of those false bids, *id.* ¶ 210, give GAIC and NASCO more than enough information to put them on notice of the specific claims against them and allow them to prepare a defense. They know the precise contracts at issue, the place of performance, and the timeframe of performance (and thus the timeframe of the operative bids and claims for payment). They can thus review the specific bids, task orders, and claims for payment at issue and examine their correspondence as to each. And they can prepare specific defenses as to each. Rule (9)b requires nothing more.

## II.     The FAC sufficiently pled conspiracy claims.

The FAC also stated a claim for FCA conspiracy. A conspiracy claim under the FCA requires that a complaint "allege (1) an unlawful agreement between defendants to commit a violation of § 3729(a)(1); (2) an act performed in furtherance of the conspiracy; and (3) that the United States suffered damages as a result." *United States v. HPC Healthcare, Inc.*, 723 F. App'x 783, 791 (11th Cir. 2018).

The FAC pled these elements with more than enough detail to satisfy Rule 9(b). It alleges that, through a series of email and phone communications and in-person

meetings in Cincinnati in August and September 2012, GAIC and NASCO formed a conspiratorial agreement to seize ownership and control of DWG, FAC ¶¶ 89-103 (August 2012 meetings between GAIC and NASCO); ¶¶ 138-39 (September 23, 2012 meeting between GAIC and NASCO to finalize takeover of DWG through the Final MAS Agreement)—a conspiracy that was then reduced to writing in the Final MAS Agreement, *id.* ¶¶ 141-60; *id.* Exhibit I.

Thus, the FAC sets forth the "time, place, and substance" of the conspiracy, including the specific meetings and documents involved, and "who engaged in them." *Urquilla-Diaz*, 780 F.3d at 1051. Indeed, the FAC could not be clearer regarding the conspiracy: it includes the full document codifying the conspiracy (the above-mentioned Final MAS Agreement) by assigning away 100% of DWG's revenue to GAIC and NASCO, even though SBA regulations required that he have the right to 51% of the annual dividends and retained earnings. FAC ¶¶ 8, 14, 141, 197.

As a result, the District Court's ruling that "Relators fail to identify with particularity any agreement that was made to defraud the United States regarding task orders, when it was made, and who actually made it" is wrong. D.E. 94 at 22. And for all the reasons discussed above concerning the FCA's falsity element, the District Court's dismissal of the conspiracy claims for failing to establish the "existence of a false claim," *id.*, was incorrect.

## CONCLUSION

The Court should reverse the District Court's decision dismissing the FAC.

Dated: May 5, 2023

Respectfully submitted,

*/s/ Glenn E. Chappell*
Glenn E. Chappell
Jonathan K. Tycko
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., N.W.
Suite 1010
Washington, D.C. 20006
Tel.: (202) 973-0900
Fax: (202) 973-0950
gchappell@tzlegal.com
jtycko@tzlegal.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I, Glenn E. Chappell, certify the following:

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(b) because it contains 12,929 words (exclusive of the portions exempted by Fed. R. App. P. 32(f), which is less than the maximum length of 13,000 words allowed for a party's principal brief.

This brief complies with the typeface and formatting requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) as it has been written in a 14-point proportionally spaced font set in plain, roman style.

Dated: May 5, 2023        /s/ *Glenn E. Chappell*
                                                  Glenn E. Chappell

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on May 5, 2023 I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: May 5, 2023                                    /s/ *Glenn E. Chappell*
                                                      Glenn E. Chappell