Case No. 23-10600

# United States Court of Appeals
*for the*
# Eleventh Circuit

———————————————————————

Brent Berry and Sean Gose, as Personal Representative of the Estate of Dennie Gose,

*Plaintiffs/Appellants,*

v.

Native American Services Corporation and
Great American Insurance Company, Inc.,

*Defendants/Appellees.*

———————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Case No. 8:16-cv-03411-SCB-AEP

## BRIEF OF APPELLEES
## GREAT AMERICAN INSURANCE COMPANY, INC., and
## NATIVE AMERICAN SERVICES CORPORATION

MATTHEW J. CONIGLIARO
ADAM P. SCHWARTZ
ERIN J. HOYLE
CARLTON FIELDS, P.A.
4221 W. Boy Scout Blvd., Suite 1000
Tampa, Florida 33607-5780
(813) 223-7000

*Counsel for Great American
Insurance Company, Inc.*

MATTHEW E. FEINBERG
TODD M. REINECKER
PILIEROMAZZA PLLC
1001 G Street N.W., Suite 1000
Washington, D.C. 20001
(202) 857-1000

*Counsel for Native American Services
Corporation*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Appellee Great American Insurance Company is a wholly owned subsidiary of American Financial Group (AFG), a publicly traded company.

Appellee Native American Services Corporation has no parent corporation, and no publicly held corporation owns 10 percent or more of NASCO's stock.

\* \* \*

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Local Rule 26.1-1, the following is a complete list of all persons who have an interest in the outcome of this proceeding, including any publicly held company that owns 10% of more of a party's stock.

1. American Financial Group (AFG), parent of Appellee Great American

2. Barry, Brent, Appellant

3. Boynton, Brian M., Principal Deputy Assistant Attorney General

4. Bucklew, Honorable Susan C., United States District Judge

5. Carlton Fields, P.A., counsel for Appellee Great American

6. Cendali, Allison, counsel for U.S. Department of Justice

7. Chappell, Glenn, counsel for Appellants

8. Conigliaro, Matthew J., counsel for Appellee Great American

9. Cummings, Brian R., counsel for Appellee NASCO

10.   Emden, Christopher J., Assistant United States Attorney

11.   Feinberg, Matthew, counsel for Appellee NASCO

12.   Gose, Dennie, Deceased Relator

13.   Gose, Sean, Appellant

14.   Great American Insurance Company, Appellee

15.   Greenspoon Marder, LLP, counsel for Appellee NASCO

16.   Handberg, Roger B., United States Attorney

17.   Hoyle, Erin J., counsel for Appellee Great American

18.   Majors, Jay D., counsel for U.S. Department of Justice

19.   Native American Services Corporation, Appellee

20.   PilieroMazza, PLLC, counsel for Appellee NASCO

21.   Porcelli, Honorable Anthony E., United States Magistrate Judge

22.   Reinecker, Todd M., counsel for Appellee NASCO

23.   Schwartz, Adam P., counsel for Appellee Great American

24.   Strombren, Elaine, counsel for Appellants

25.   Tycko, Jonathan, counsel for Appellants

26.   Tycko & Zavareei, LLP, counsel for Appellants

27.   United States of America

28.   United States Department of Justice

29.   Wilbanks and Gouinlock, LLP, counsel for Appellants

30.     Yavelberg, Jamie A., counsel for U.S. Department of Justice

## **STATEMENT REGARDING ORAL ARGUMENT**

In this appeal, Appellants continue their misplaced efforts to claim that the contractor and federally mandated surety who saved Appellants' company from financial ruin, and from defaulting on its government construction projects, violated the False Claims Act by doing so. The district court correctly ruled that Appellant's claims misapply the Small Business Administration's regulations, the False Claims Act's requirements, and basic principles of pleading fraud with particularity. This brief further explicates what the district court's orders made clear: Appellants' claims fail from the outset. While Appellees would appreciate the opportunity to participate in oral argument and amplify the grounds for affirmance, Appellees respectfully suggest that oral argument will not aid the Court's review,

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ..................................C-1 of 3

STATEMENT REGARDING ORAL ARGUMENT .............................................iv

TABLE OF CITATIONS.................................................................................. vii

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUES ........................................................................2

STATEMENT OF THE CASE ...........................................................................3

      A.     Course of Proceedings Below............................................................4

      B.     Statement of the Facts .....................................................................6

      C.     Standard of Review .......................................................................18

SUMMARY OF ARGUMENT ........................................................................20

ARGUMENT....................................................................................................22

I.     In Counts I and II of the Amended Complaint, Relators Failed to State
      Claims for Presentment of a False or Fraudulent Claim under 31 U.S.C.
      § 3729(a)(1)(A)........................................................................................24

      A.     Relators Failed to Allege Falsity Because They Failed to Allege
             that DWG Was Actually Ineligible Due to a Supposed Lack of
             Control or Lack of Ownership .......................................................25

             1.     Control.................................................................................25

             2.     Ownership ...........................................................................35

B.     Moreover, Relators Failed to Allege Presentment of a False or Fraudulent Claim Because They Failed to Allege Anything False or Fraudulent in DWG's Task Order Bids that Extended to its Payment Requests ...............................................................................39

C.     In All Events, Relators Failed to Plead with Particularity..................47

II.    In Counts III and IV of the Amended Complaint, Relators Failed to State a Claim for Making or Using a False Record Material to a False or Fraudulent Claim under 31 U.S.C. § 3729(a)(1)(B). ...............................49

III.   In Counts V and VI of the Amended Complaint, Relators Failed to State a Claim for Conspiracy under 31 U.S.C. § 3729(a)(1)(B) ...........................50

CONCLUSION ................................................................51

CERTIFICATE OF COMPLIANCE......................................................52

CERTIFICATE OF SERVICE............................................................52

# TABLE OF CITATIONS

**Cases**                                                                                                          **Page**

*A1 Procurement, LLC v. Thermor, Inc.*,
    2017 WL 2881350 (E.D. Va. Jul. 5, 2017)..................................................27

*Carrel v. AIDS Healthcare Found., Inc.*,
    898 F.3d 1267 (11th Cir. 2018)......................................... 24, 47–48

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005)..................................................47

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999)......................................................43

*Hartford Fire Ins. v. United States*,
    108 Fed. Cl. 525 (2012) ...........................................................22

*Hill v. White*,
    321 F.3d 1334 (11th Cir. 2003)..................................................18

*Hylton v. U.S. Att'y Gen.*,
    992 F.3d 1154 (11th Cir. 2021)..................................................33

*In re Baycol Prod. Litig.*,
    732 F.3d 869 (8th Cir. 2013).....................................................43

\* *In re David's Custom Roofing & Painting, Inc.*,
    SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010)................ 28, 30, 35

\* *In re Reality Techs., Inc.*,
    SBA No. BDP-455, 2012 WL 8134444 (Nov. 21, 2012) .....................28–29

*K.C.R. ex rel. Gill v. Judd*,
    941 F.3d 504 (11th Cir. 2019)...................................................19

*Miles Constr., LLC v. United States*,
    108 Fed. Cl. 792 (2013) ...........................................................38

*Nat'l RR Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002)......................................................32

*Newbauer v. Carnival Corp.*,
   26 F.4th 931 (11th Cir. 2022)....................................18–19

*Rafferty v. Denny's, Inc.*,
   13 F.4th 1166 (11th Cir. 2021)..................................34–35

\* *Size Appeal of: FTSI-Phelps JV*,
   SBA No. SIZ-5583, 2014 WL 4804769 (Aug. 19, 2014) ...............28–29, 35

\* *Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   579 U.S. 176 (2016)........................................ 16, 40–41, 44–45

\* *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*,
   3 F.4th 412 (D.C. Cir. 2021) ...............................42–44

\* *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
   290 F.3d 1301 (11th Cir. 2002)......................... 39, 44, 47

*United States ex rel. Hendow v. Univ. of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006)......................................43

*United States ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943)................................................41

*United States ex rel. Marsteller v. Tilton*,
   880 F.3d 1302 (11th Cir. 2018).................................42

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
   857 F.3d 1148 (11th Cir. 2017).............................24, 50

*United States ex rel. Taylor v. Gabelli*,
   345 F. Supp. 2d 313 (S.D.N.Y. 2004) ........................41

*United States v. Mead*,
   533 U.S. 218 (2001)...............................................32

*Veterans Contracting Group, Inc. v. United States*,
    133 Fed. Cl. 613 (Fed. Cl. 2017)................................................38

*Washington v. Comm'r of Soc. Sec.*,
    906 F.3d 1353 (11th Cir. 2018)...............................................26

*Ziemba v. Cascade Int'l, Inc.*,
    256 F.3d 1194 (11th Cir. 2001)...............................................47

## Statutes

15 U.S.C. § 637(a)(9)...............................................................46

15 U.S.C. § 637(a)(21)(A) ......................................................32

28 U.S.C. § 1291.......................................................................1

28 U.S.C. § 1331.......................................................................1

31 U.S.C. §§ 3729–33...........................................................1, 4

31 U.S.C. § 3729(a)(1)(A) ..........................................21, 24, 40

31 U.S.C. § 3729(a)(1)(B) .................................................49–50

31 U.S.C. § 3729(a)(1)(C) ......................................................50

## Regulations

13 C.F.R. § 124.1 (2004) .....................................................6, 27

13 C.F.R. § 124.2 (2004) ..................................................6–7, 27

13 C.F.R. § 124.2 (2010) ....................................................8–10

13 C.F.R. § 124.3 (2012) ..............................20, 26, 31, 37–38

13 C.F.R. § 124.101 (2004).......................................................7

13 C.F.R. § 124.105 (2012)...................................................... 2, 6, 9, 13–16, 35–38

13 C.F.R. § 124.106 (2012)................................................2, 6, 9, 13–16, 25, 33, 35

13 C.F.R. § 124.106 (2023) ...............................................................................34

13 C.F.R. § 124.301 .......................................................................................7, 34

13 C.F.R. § 124.302 (2012) ..................................................................................27

13 C.F.R. § 124.302(a) (2012) ..............................................................................30

13 C.F.R. § 124.302(a)(1) (2010)......................................................................9, 27

13 C.F.R. § 124.302(d) (2010) .........................................................................9, 27

13 C.F.R. § 124.304(f) (2009) ..............................................................................31

13 C.F.R. § 124.304(f) (2010)........................................................................9, 27, 31

13 C.F.R. § 124.507(d) (2012) .............................................................................31

13 C.F.R. § 124.515 (2012)..............................................13–15, 26, 30, 33, 35–36

13 C.F.R. § 124.603 .......................................................................................30, 35

48 C.F.R. § 1.602-1(a) .........................................................................................46

48 C.F.R. § 1.602-2...............................................................................................46

48 C.F.R. § 9.103(a) (2012) .................................................................................23

48 C.F.R. § 9.104-1(a) (2012) .............................................................................23

48 C.F.R. § 19.812(d) ..........................................................................................32

48 C.F.R. § 52.228-15...........................................................................................8, 22

88 Fed. Reg. 26164-01, 2023 WL 3115896 (Apr. 27, 2023) ..........................33–34

## Rules

Fed. R. Civ. P. 9(b) ........................................................................24, 47

Fed. R. Civ. P. 12(b)(6)..............................................................24

## Other

SBA Standard Operating Procedure for the Office of Business
Development, SOP 80 05 5, ch. 10, § 2.d (2016) ...................................................32

# STATEMENT REGARDING JURISDICTION

Appellants initiated the litigation below by filing a complaint (Doc. 1) containing claims allegedly predicated on the False Claims Act, 31 U.S.C. §§ 3729–33. The district court had federal question jurisdiction over the action pursuant to 28 U.S.C. § 1331.

The district court dismissed the action with prejudice. Doc. 94. Appellants timely filed a motion for reconsideration, which the district court denied. Docs. 95, 104. Appellants timely filed a notice of appeal. Doc. 105. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly determined that Appellants' False Claims Act claims failed to plead falsity predicated on their company's supposed loss of control and ownership under 13 C.F.R. §§ 124.105 and 124.106 (2012), when those regulations govern "Participants" and, at the time, the company was no longer a "Participant" in the Small Business Association's section 8(a) Business Development program.

2.      Whether the district court correctly determined that Appellants' False Claims Act claims failed to plead falsity predicated on their company's supposed loss of ownership under 13 C.F.R. § 124.105 (2012) based on a contractual right of first refusal that, unlike an option agreement, gave no person an interest in the company.

3.      Whether the district court correctly determined that Appellants' False Claims Act claims failed to plead presentment of a false claim when Appellants asserted Appellees caused "false bids" to be submitted to the federal government but failed to plead falsity that extended to any actual claims for payment, and Appellants now admit that the bids and the claims for payment "[did] not contain false content." (Br. at 47).

4.      Whether the district court correctly determined that Appellants' False Claims Act claims failed to plead fraud with particularity when Appellants asserted

that Appellees caused "false bids" to be submitted to the federal government, supposedly resulting in false claims, but Appellants failed to provide the who, what, when, where, and how details of any bids or payment requests.

## STATEMENT OF THE CASE

Appellants Sean Gose, as personal representative of the estate of Dennie Gose ("Gose"), and Brent Berry ("Berry"), relators below (collectively, and including Dennie Gose where appropriate, "Relators"), have appealed from the district court's order dismissing with prejudice their amended complaint against defendants Great American Insurance Company ("Great American") and Native American Services Corporation ("NASCO") (collectively, "Defendants"). The district court correctly dismissed Relators' claims.

As the amended complaint alleges, Relators Gose and Berry owned and operated a small government contractor that grew too big, became insolvent, and found itself on the brink of collapse when it called on its federally mandated surety, and a new subcontractor of its own choosing, to rescue its failing projects. Great American and NASCO saved the contractor, along with its federal projects, at a cost to the surety of tens of millions of dollars.

Years later, Relators launched a brazen effort to blame Great American and NASCO for Relators' own mismanagement, accusing Defendants of plotting to take control of the failing contractor, as if that makes any sense. Relators seek to recover

3

for the Government "more than $50 million" (Doc. 76 ¶ 14) in payments for federal construction work that was fully and fairly completed to each contracting agency's satisfaction. Relators also seek treble damages, along with the "maximum" award for themselves. Doc. 76 ¶¶ 272, 275.

The Government spent nearly five years delving into the minutiae of the contractor's business and the saving efforts of the surety and the new subcontractor. The Government found no basis to intervene. Doc. 29.

The district court found no basis for Relators to proceed, as their amended complaint failed to state a cause of action. Docs. 99, 104. In this brief, Defendants will demonstrate that this Court should affirm the district court's dismissal.

### A.    Course of Proceedings Below

Relators filed their original complaint, under seal, in December 2016. Docs. 1–3. It purported to assert claims under the False Claims Act, 31 U.S.C. §§ 3729–33. (the "FCA"), against Defendants Great American and NASCO. The government thoroughly investigated the complaint's allegations, filing nine motions that ultimately extended the time to intervene by nearly five years. Docs. 7, 10, 12, 14, 16, 20, 23, 25, 27. In August 2021, the government declined to intervene. Doc. 29.

Upon being served with the unsealed complaint, Defendants each moved to dismiss the complaint with prejudice, asserting myriad pleading deficiencies. Docs.

70, 71.  Relators responded by filing their first amended complaint (the "amended complaint").  Doc. 76.

Defendants again moved to dismiss with prejudice.  Docs. 85–86.  After full briefing, the district court granted Defendants' motions and dismissed the amended complaint with prejudice for failure to state a claim for relief.  Doc. 94.  The district court found the amended complaint deficient on three distinct grounds: (1) Relators misinterpreted two SBA regulations and relied on those misinterpretations to allege falsity (Doc. 94 at 11–14), (2) Relators failed to allege that Defendants presented any supposedly false claim to the government (*id.* at 17–19), and (3) Relators failed to plead their claims with the particularity required for FCA claims (*id.* at 19–20).

Relators moved for reconsideration and included therein a new argument that they should be given leave to amend, despite failing to attach a proposed amended pleading or even describe what amendments they would make.  Doc. 95 at 3–4 & n.1.  The government filed a statement of interest that took no position on the sufficiency of Relators' factual allegations but disagreed with the district court's interpretation of certain regulations and what the government mistakenly characterized as the district court's ruling that fraudulent inducement was not actionable under the FCA.  Doc. 102.

Defendants opposed Relators' reconsideration motion, and the district court soon denied it.  Docs. 103, 104.  The district court pointed out that, contrary to the

government's statement of interest, the court did not rule that fraudulent inducement was not actionable under the FCA.  Doc. 104 at 5 n.1

Relators timely filed a notice of appeal.  Doc. 105.  This proceeding followed.

In this appeal, the government has appeared as an amicus curiae not to address the sufficiency of Relators' allegations but to challenge the district court's interpretation of 13 C.F.R. §§ 124.105 and 124.106 (2012).  Am. Br. at 1–2, 8 & n.3.  Notably, the government has abandoned its previously stated concern about the district court's order as it relates to fraudulent inducement.  *See* Am. Br. at 8 n.3.

## B.      Statement of the Facts

### 1.      Relators' Amended Complaint

#### *DWG and Its Certification as an 8(a) BD Program Participant*

According to Relators' amended complaint, Dennie Gose was a disabled veteran who founded DWG & Associates, Inc. ("DWG"), a construction contractor, in 1995.  Doc. 76 ¶¶ 18, 68.  The U.S. Small Business Administration ("SBA") certified DWG as a "Participant" in SBA's 8(a) Business Development program (the "8(a) BD program") in 2004.  *Id.* Ex. A.  "The purpose of the 8(a) BD program is to assist eligible small disadvantaged business concerns compete in the American economy through business development."  13 C.F.R. § 124.1 (2004).

"A Participant receives a program term of nine years from the date of SBA's approval letter certifying the concern's admission to the program."  13 C.F.R.

§ 124.2 (2004). "The Participant must maintain its program eligibility during its tenure in the program and must inform SBA of any changes that would adversely affect its program eligibility." *Id.* The eligibility requirements include that the Participant qualifies as a small business and that one or more disadvantaged individuals unconditionally owns and controls the Participant. 13 C.F.R. § 124.101 (2004); *see also* 13 C.F.R. § 124.108 (2004) (other requirements).

"A firm that completes its nine year term of participation in the 8(a) BD program is deemed to graduate from the program. The nine year program term may be shortened only by termination, early graduation or voluntary graduation . . . ." 13 C.F.R. § 124.2 (2004). There are no other ways to exit the program. *Id.*; *see also* 13 C.F.R. § 124.301 (2004) (explaining ways to leave the 8(a) BD program).

When DWG became a Participant in 2004, it qualified as a small business. Doc. 76 ¶ 6. At that time, Gose was a disadvantaged individual under the 8(a) BD program. *Id.* ¶¶ 38, 69. He owned 51 percent of DWG's shares and served as its chief executive officer. *Id.* ¶ 18. Relator Berry owned the remaining 49 percent of shares and served as DWG's chief financial officer. *Id.* ¶¶ 19, 68, 196.

### DWG's Initial Success and Early Graduation from the Program

DWG successfully bid on numerous federal construction contracts, including multiple-award contracts. *Id.* ¶ 70. A multiple-award contract vehicle, sometimes referred to as an indefinite delivery, indefinite quantity ("IDIQ") contract, is a type

of contract vehicle by which the government establishes a pool of contractors that are eligible to bid on task orders issued under a specific IDIQ contract. *See id.* ¶ 3.

Beginning in 2004, DWG obtained its performance and payment bonds from Great American. *Id.* ¶ 74. Federal law requires all contractors awarded federal construction contracts to furnish the government with performance and payment bonds. *See* 48 C.F.R. § 52.228-15. Surety bonds help protect the government from a contractor's financial failure and its resulting inability to complete a contract, ensuring that the contractor's projects are completed and its labor and materials debts are paid. Also in 2004, and long before DWG's financial troubles, DWG, its principals Gose and Berry, and their spouses entered an indemnification agreement with Great American by which they each agreed to indemnify the surety for losses should it be called upon to advance funds or otherwise incur losses on bonds written to DWG. Doc. 76 ¶ 71, Ex. B at 1.

The amended complaint admitted that, in 2010, just six years into its nine-year program term, DWG outgrew its "small" business status and so was no longer eligible to bid on new 8(a) BD program contracts. *Id.* ¶ 72. That admission was critical. To remain in the 8(a) BD program, a Participant must remain eligible. *See* 13 C.F.R. § 124.2 (2010) ("The Participant must maintain its program eligibility during its tenure in the program . . . ."). Under the SBA regulations, a Participant can exit the 8(a) BD program only by early graduation, voluntary graduation, or

termination. 13 C.F.R. § 124.2 (2010). When Relators pled that DWG outgrew its small business status and was no longer eligible to bid on new 8(a) BD program contracts, Relators admitted that DWG in fact graduated early from the program. *See* 13 C.F.R. § 124.302(a)(1), (d) (2010) (explaining early graduation). Relators acknowledged as much before the district court. *See* Doc. 87 at 11 (admitting "DWG graduated from the 8(a) Program in 2010").

Because DWG had graduated, it was no longer a Participant in the 8(a) BD program. *See* 13 C.F.R. § 124.3 (2010) (defining "Participant" as "a small business concern admitted to participate in the 8(a) BD program."). It was also "no longer eligible to receive any 8(a) BD program assistance." 13 C.F.R. § 124.304(f) (2010). Nonetheless, DWG's early graduation did not mean DWG could not complete the 8(a) BD program contracts it had been awarded prior to graduation or seek new task orders under its existing IDIQ contracts. To the contrary, upon a business's early graduation or termination from the program, it remains "obligated to complete [its] previously awarded 8(a) [BD program] contracts," § 124.304(f)(1) (2010), and can apply for additional task orders on an existing IDIQ or multiple-award contract.

Most significant here, once DWG graduated and was no longer a Participant, the SBA regulations regarding unconditional ownership and control no longer applied. *See* 13 C.F.R. §§ 124.105 (2010) (unconditional ownership requirement applies to an "applicant or Participant"), 124.106 (same for control). Likewise, the

SBA regulation creating an obligation to report changes in unconditional ownership and control no longer applied, as it too applied only to Participants. *See* 13 C.F.R. § 124.2 (2010) ("The Participant must maintain its program eligibility during its tenure in the program and must inform SBA of any changes that would adversely affect its program eligibility.").

### *DWG's Collapse*

As of 2012, DWG was still performing 14 government contracts, six of which were IDIQ contract vehicles set aside for 8(a) small businesses. Doc. 76 ¶¶ 6, 72–73. DWG failed, however, to maintain its financial health. By June 2012, DWG's financial condition had deteriorated to the point the company was insolvent and in danger of defaulting on its loans. *Id.* ¶ 75. On June 21, 2012, DWG sent its surety, Great American, a letter confirming its default on the contracts previously bonded by Great American. Doc. 76-1 at 4. The letter also confirmed that DWG could not afford to complete the construction contracts for which Great American had issued surety bonds. *Id.*

### *Great American and NASCO Rescue DWG and Its Federal Projects*

At DWG's request, Great American promptly advanced millions of dollars in financial aid to DWG, permitting it to meet its financial and performance obligations under the bonded governmental contracts. Doc. 76 ¶¶ 80–81. The amended complaint acknowledged that, by the end of June 2012, DWG's debt to Great

American exceeded $5.5 million. *Id.* By July, DWG estimated the amount to exceed $10 million. *Id.*

In connection with those advances, DWG and Great American also executed a financing agreement. Doc. 76-1 at 7. Relators implausibly accuse Great American of swooping in to take advantage of a failing contractor (as if that were an attractive business proposition), but according to the financing agreement, ***it was DWG that proposed*** that its federal contracts "may yield value for [DWG's] creditors by attracting business partners to share in the revenue from these contracts . . . and having [an] equity purchaser or critical subcontractor share the revenue . . . ." *Id.* at 7–8.

DWG's CFO, Relator Berry, launched a search for investors and a critical subcontractor. Doc. 76 ¶¶ 83–85. He located NASCO and began discussions, and NASCO proposed teaming with DWG. *Id.* ¶¶ 87–90. That proposal was well received, and by September 2012, DWG and NASCO had entered teaming agreements for each of DWG's government contracts. *Id.* ¶¶ 116–20.

Later that same month, DWG, Great American, and NASCO entered a written agreement titled Management and Advisory Services Agreement (the "MAS Agreement"). Doc. 76-1 at 54. The MAS Agreement identified NASCO as a critical subcontractor that would provide DWG with management consulting and advisory services, and it identified Great American not as someone seeking to take advantage

of DWG, but as the surety that "shall provide **all funding** for and pay for **all costs** associated with" DWG's federal projects. *Id.* at 54, 62 (¶ 15.c.) (emphasis added).

Later that same year, Great American, DWG, Gose, and Berry, along with their spouses, entered into a written agreement titled Forbearance, Settlement and Release Agreement (the "Forbearance Agreement"). *Id.* at 70. It recognized that, to that point, Great American had paid DWG over $11.5 million to fund its operations and had paid DWG's bank $1.35 million to purchase the operating loan on which DWG had defaulted. *Id.* at 70–71. Great American agreed to forbear enforcing its indemnification rights so long as the MAS Agreement remained in effect, and Great American agreed to release Gose, Berry, and their spouses entirely upon completion of DWG's government contracts if Gose and Berry assisted Great American and NASCO under their various agreements. Doc. 76 ¶ 147; Doc. 76-1 at 72–73.

Finally, NASCO, Gose, and Berry also entered a written agreement titled Right of First Refusal and Option Agreement (the "Right of First Refusal"). Doc. 76-1 at 83. It provided NASCO with the right to purchase Gose's 51 percent interest in DWG in the event of his death or disability or if he agreed to sell his shares to a third party. *Id.* at 85–89. It also provided NASCO an option to purchase Berry's 49 percent interest without regard to death, disability, or an agreement to sell. *Id.*

### *Gose's Alleged Loss of Control and Ownership*

Relators allege that the agreements Great American and NASCO made with DWG and its principals—the same agreements Relators voluntarily signed to avoid defaulting on their contracts and incurring millions of dollars in indemnification liability—eliminated Gose's control and unconditional ownership of DWG. Relators further assert that Defendants and DWG failed to disclose the changes to SBA. Relators rely on 13 C.F.R. §§ 124.106 and 124.515 (2012) with respect to control and 13 C.F.R. §§ 124.105 and 124.515 (2012) with respect to ownership. Relators claim that, due to the supposed loss of control and ownership, DWG's 8(a) contracts were "subject to mandatory termination" and were "required to be terminated no later than November 15, 2012," the date by which the agreements described above were all executed. *Id.* ¶¶ 192, 200, 204.

### *DWG Obtains Additional Task Orders and Completes Its Contracts*

Relators allege that, following execution of these written agreements, DWG continued to perform its government contracts. Doc. 76 ¶¶ 174–86. In the course of that performance, DWG bid on and obtained additional task orders from various procuring agencies under DWG's existing 8(a) IDIQ contracts. Doc. 76 ¶¶ 181-85, 207-21, 234. Relators claim that, in doing so, DWG supposedly failed to disclose the asserted changes in Gose's control and ownership of the company and its failure to obtain a waiver. *Id.* ¶¶ 126-63, 192-99.

Relators acknowledge that DWG ultimately completed all of its federal construction projects.  *See id.* ¶ 189.  They assert that the government paid DWG "more than $50 million" for the work performed on the additional task orders DWG obtained after it was supposedly ineligible for the 8(a) BD program.  *Id.* ¶ 14.  Relators do not suggest that any of the work was deficient in any way.

### *Relators' Claims*

Relators contend that 13 C.F.R. §§ 124.105, 124.106, and 124.515 (2012) obligated DWG to inform SBA of the supposed changes in control and ownership and that the failure to do so, and obtain a waiver, left DWG ineligible for the 8(a) BD program.  Doc. 76 ¶¶ 39–45, 198–221.  Invoking the False Claims Act, Relators allege that DWG submitted "false bids" for additional task orders without revealing that the company was supposedly no longer eligible for the 8(a) BD program due to Gose's alleged loss of control and ownership.  *Id.* ¶ 207.  Relators claim that by bidding on the task orders, Great American and NASCO "fraudulently induced, and/or caused DWG to fraudulent[ly] induce, the Government to award task orders under the 8(a) contracts to DWG."  *Id.* ¶ 209.  The amended complaint contains no details regarding any task order bid or any claim for payment.  Relators provide details only regarding the government's task orders themselves, and then only with respect to what Relators term "representative examples" of task orders.  *Id.* ¶¶ 210–19.

## 2.     The District Court's Dismissal

Defendants moved to dismiss the amended complaint with prejudice.  Docs. 85, 86.  Defendants argued that Relators failed to state claims under the FCA for three principal reasons.  First, Relators' falsity allegations turned on what Relators claimed were changes in control and ownership of DWG under 13 C.F.R. §§ 124.105, 124.106, and 124.515, but those provisions no longer applied to DWG once it graduated early from the program in 2010.  Furthermore, no loss of ownership occurred as a matter of law because, unlike an option agreement, the right of first refusal on which Relators relied to assert a change in ownership did not produce any change in ownership.

Second, Defendants asserted that, even if Relators plausibly alleged DWG had a duty to disclose to SBA supposed changes in control or ownership, Relators nonetheless failed to allege that anyone presented false claims to the government.  Relators relied on a fraudulent inducement theory, alleging that DWG's bids with various agencies were supposedly "false bids" that fraudulently induced the government to enter contracts with DWG for the additional task orders (Doc. 76 ¶ 207), but Relators failed to assert how any falsity existed in the bids and how that falsity supposedly extended to any claim for payment under the FCA.

Finally, and in all events, Defendants asserted that Relators failed to allege their claims with the particularity required by Federal Rule of Civil Procedure 9(b).

Relators pled no details whatsoever regarding any supposedly false bids or any claims for payment. The only specificity contained in the amended complaint pertained to what Relators described as "representative examples" of the federal government's 8(a) task orders on which DWG bid. *See* Doc. 76 ¶¶ 210–19.

After the parties fully briefed the issues, the district court agreed with Defendants in all respects. Doc. 94. With respect to falsity, the district court ruled that, by 2012, DWG was no longer a "Participant" under SBA's regulations and therefore the control and ownership requirements of 13 C.F.R. §§ 124.105 and 124.106 did not apply. Doc. 94 at 13–15. The district court also ruled that NASCO's right of first refusal did not destroy Gose's unconditional ownership of DWG. *Id.* at 15-17.

Next, the district court pointed out that the FCA "is not 'an all-purpose antifraud statute'" and thus, even if DWG had duties to disclose changes in control or ownership, an FCA claim can lie only where the falsity or fraudulent conduct is found in a claim for payment. *Id.* at 19 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016)). The district court ruled that Relators were proceeding under a theory of fraudulent inducement, not express false certification or implied false certification, and that Relators failed to assert any falsity that extended to a claim for payment. Doc. 94 at 18–19.

Last, the district court ruled that Relators failed to plead the who, what, where, when, and how surrounding the supposedly false or fraudulent claims, namely the bids that were supposedly fraudulent and the claims for payment supposedly at issue. *Id.* at 19. The district court expressly rejected Relators' argument that "details of the bids are not necessary, because bidding itself was fraudulent, not the specific representations made in the bids." *Id.* at 19–20 (quoting Doc. 87 at 32 n.12).

As Defendants requested, the district court dismissed the amended complaint with prejudice. *Id.* at 23. Relators had not requested leave to amend, much less explained what amendments they would make or submitted a proposed amended pleading. The district court concluded that any further efforts to amend would be futile. *Id.*

### 3.     Relators' Motion for Reconsideration

Relators moved for reconsideration and essentially reargued the motions to dismiss. Doc. 95. Relators included in that motion a request for leave to amend, but they made no representations regarding what amendments they would make and they attached no proposed amended pleading.

The government filed a statement of interest in support of reconsideration. Doc. 102. The government took no position on whether Relators had stated a claim for relief but disagreed with the district court's ruling that, following its early graduation, DWG was no longer a "Participant" under the SBA regulations. The

government also disagreed with what it perceived to be the district court's ruling that fraudulent inducement was not actionable under the FCA.

The district court denied Relators' reconsideration motion in all respects. Doc. 104. In doing so, the court explained that, contrary to the government's view, the district court did not rule that fraudulent inducement was not actionable under the FCA but rather ruled that Relators failed to set forth a fraudulent inducement claim in which the alleged falsity extends to a claim for payment. Doc. 104 at 5 n.1. Relators timely filed a notice of appeal. Doc. 105.

In this appeal, the government has filed an amicus curiae brief to address the district court's ruling that, after graduation, DWG was no longer a "Participant" in the 8(a) BD program. Am. Br. at 1–2, 8 & n.3. The government has abandoned its previously stated concern about the district court's order as it relates to fraudulent inducement, and the government takes no position on whether the amended complaint's allegations stated a claim for relief. Am. Br. at 8 n.3.

## C.    Standard of Review

This Court reviews de novo a district court's grant of a motion to dismiss for failure to state a claim for relief. *E.g.*, *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003). A complaint that provides labels and conclusions or a formulaic recitation of elements is not adequate to survive a motion to dismiss. *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022).

When evaluating a motion to dismiss, a court eliminates any allegations that are merely legal conclusions. *Id.* The court assumes the veracity of well-pleaded factual allegations and determines whether they plausibly give rise to an entitlement to relief. *Id.* at 934–35. If allegations are more conclusory than factual, then a court does not have to assume their truth. *Id.* at 934. Furthermore, when exhibits attached to a complaint contradict the pleading's general and conclusory allegations, the exhibits govern. *K.C.R. ex rel. Gill v. Judd*, 941 F.3d 504, 514 (11th Cir. 2019).

# SUMMARY OF ARGUMENT

<u>Point I.A.</u>  The district court correctly determined that Relators failed to allege falsity based on DWG's supposed ineligibility for the 8(a) BD program.  Relators contend that NASCO and Great American deprived Gose of control and ownership of the company and failed to disclose that supposed change to the SBA.  But Relators misread the applicable SBA regulations, which apply to "participants."  Relators' brief never mentions the definition of that term, which extends only to "a small business concern admitted to participate in the 8(a) BD program."  13 C.F.R. § 124.3 (2012).  Years before DWG collapsed, it had outgrown its small status and was forced to graduate early from the program.  As a result, under the plain language of the term's definition and SBA's contemporaneous decisions, DWG was no longer a participant in the 8(a) program but rather a graduate or former participant.

The district court also correctly determined that Relators failed to allege falsity regarding ownership because the documents Relators relied upon did not actually deprive Gose of unconditional ownership.  A right of first refusal is not an unexercised option to purchase.  Nor was Gose deprived of any right to dividend or earnings distributions, as none are alleged to have existed for DWG, a company that was insolvent at the time and required tens of millions of dollars from its surety to perform its government contracts.

Point I.B.   In addition, the district court correctly determined that, for fraudulent inducement to be cognizable under the FCA, the false or fraudulent conduct must extend to a claim for payment, and Relators failed to make such allegations in this case.   Relators allege that DWG's task order bids were false or fraudulent because they failed to disclose DWG's supposed change in eligibility. But Relators never assert that anyone had a duty to make any disclosure to the procuring agencies in the task order bids or the claims for payment or that any of those submissions otherwise contained anything false or any misleading half-truth. Relators' fraudulent inducement theory can succeed only by contradicting the Supreme Court's pronouncement that the FCA is not an all-purpose antifraud statute.

Point I.C.   Finally, even if Relators asserted falsity and presentment, the district court correctly determined that Relators failed to plead their FCA claims with particularity.   They failed to allege the who, what, when, where, and how regarding the task order bids and the claims for payment at issue.

Point II.   Because the same defects that render Relators' FCA claims under 31 U.S.C. § 3729(a)(1)(A) insufficient also apply to their claims under § 3729(a)(1)(B), the district court correctly dismissed the latter claims as well.

Point III.   The district court correctly dismissed Relators' FCA conspiracy claim because Relators failed to present an underlying FCA claim, and because they failed to assert that Defendants agreed to defraud the federal government.

# ARGUMENT

Relators present themselves as victims of a scheme to seize control of DWG, perform work that DWG was ineligible to perform, and falsely certify DWG's eligibility. Relators' allegations cannot withstand scrutiny, and the district court correctly determined their claims to be fatally deficient on multiple grounds.

As a threshold matter, Relators' tale disregards Great American's legal duty, as surety, to secure DWG's performance for the benefit of the bond obligee, the United States government. Relators likewise ignore the critical role NASCO played in that same process, helping DWG complete the performance it could not provide on its own. Federal law requires government construction contractors such as DWG to obtain performance and payment bonds to ensure that government-funded projects are completed and workers are paid should the contractor fail to live up to its obligations. *See* 48 C.F.R. § 52.228-15.

"A surety bond is a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government)." *Hartford Fire Ins. v. United States*, 108 Fed. Cl. 525, 531 (2012). Federal law recognizes the broad discretion that sureties have to discharge their obligations to the federal government. *Id.* at 528, 531 (explaining that the surety may take over and complete the contract, allow the government to reprocure it while paying the completion costs, or provide funds to the insolvent contractor).

Under mandatory provisions of the Federal Acquisition Regulation, once DWG experienced "financial deterioration," and with the "threat of financial ruin looming" in 2012, *see* Doc. 76 ¶ 7, DWG was no longer a "responsible" contractor. Government contract "[p]urchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only." 48 C.F.R. § 9.103(a) (2012). Among other things, "[t]o be determined responsible, a prospective contractor must . . . [h]ave adequate financial resources to perform the contract, or the ability to obtain them . . . ." 48 C.F.R. § 9.104-1(a) (2012).

Great American served as DWG's surety and NASCO became DWG's critical subcontractor. Great American and NASCO provided DWG with support sufficient to permit it to continue to perform its government contracts, including additional task orders under its previously awarded 8(a) IDIQ contracts. Without their assistance, DWG would not have been able to complete its existing contracts or sell its services through additional task orders. Rather than engage in a fraudulent scheme, Great American and NASCO properly supported DWG so the company's government-funded projects would not fail. They were all completed to the government's satisfaction. The government received its buildings and avoided the delay and excess costs associated with finding additional contractors to complete DWG's projects.

## I. In Counts I and II of the Amended Complaint, Relators Failed to State Claims for Presentment of a False or Fraudulent Claim under 31 U.S.C. § 3729(a)(1)(A).

Counts I and II of the Amended Complaint assert that NASCO and Great American, respectively, violated 31 U.S.C. § 3729(a)(1)(A). "To establish a cause of action under § 3729(a)(1)(A), a relator must prove three elements: (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with the knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). Also, because the FCA is a fraud statute, Federal Rule of Civil Procedure 9(b) requires a person alleging an FCA claim to state the circumstances constituting wrongful conduct with particularity, including the who, what, when, where, and how of the purported fraud. *See, e.g.*, *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1276–77 (11th Cir. 2018).

The district court dismissed counts I and II under Federal Rules of Civil Procedure 9(b) and 12(b)(6) for three reasons. First, Relators predicated their FCA claims on DWG's alleged ineligibility to participate in the 8(a) BD program, but Relators failed to show that the eligibility requirements supposedly supporting the falsity element applied to DWG in 2012. Second, even if those requirements applied, Relators failed to allege any falsity in the claims DWG presented for payment. Indeed, on appeal, Relators admit that neither DWG's task order bids nor

its payment requests "contain false content." Br. at 47. Third, even if the eligibility requirements applied and the alleged falsity extended to DWG's claims for payment, Relators failed to plead their claims with the particularity required of FCA claims.

For each of these reasons, the district court correctly dismissed Relators' claims with prejudice. Defendants will address each ground in turn.

## A. Relators Failed to Allege Falsity Because They Failed to Allege that DWG Was Actually Ineligible Due to a Supposed Lack of Control or Lack of Ownership.

The falsity element of Relators' claims is rooted in their own false contentions that the agreements NASCO, Great American, DWG, and DWG's principals entered into to save DWG and its federal construction projects actually destroyed DWG's eligibility under the 8(a) BD program, giving rise to a supposed duty to disclose that ineligibility. The district court correctly rejected these contentions. The district court separately addressed control and ownership. Defendants will do the same.

### 1. Control

Relators allege that NASCO and Great American deprived Gose of control of his company. Defendants strongly disagree. At this stage of the litigation, however, Defendants focus on how SBA's control regulations did not apply to DWG in 2012, after it graduated early from the 8(a) BD program.

Relators' control argument relies on 13 C.F.R. § 124.106 (2012), which states that "[a]n applicant or Participant must be managed on a full-time basis by one or

more disadvantaged individuals who possess requisite management capabilities."
*Id.* As the district court correctly recognized, this regulation focuses on control at two stages: when a business applies for admission to the 8(a) BD program, and when a business is a "Participant" in the program. Section 124.515(a)(1)(i) is similar, as it requires an 8(a) contract to be terminated for the government's convenience if one or more individuals upon whom eligibility for the 8(a) BD program was based "relinquishes or enters into any agreement to relinquish . . . control of the Participant such that the Participant would no longer be controlled . . . by disadvantaged individuals . . . ." 13 C.F.R. § 124.515(a)(1)(i) (2012). These provisions did not apply to DWG in 2012, as it was not an applicant or a "Participant" at that time.

In construing a regulation, courts start, and often stop, with the regulation's text. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362 (11th Cir. 2018) (holding that, in construing a regulation, courts "start—and often end—with the text"). That should be the case here, as SBA's regulations expressly defined "Participant" as "a ***small business concern admitted to participate*** in the 8(a) BD program." 13 C.F.R. § 124.3 (2012) (emphasis added). That definition clearly did not apply to DWG in 2012, as it was no longer a small business and graduated early from the 8(a) BD program. *See Washington*, 906 F.3d at 1362 (holding that courts should construe a regulation to give effect to the natural and plain meaning of its words).

The purpose of the 8(a) BD program is to assist *small* disadvantaged businesses to compete for government contracts. 13 C.F.R. § 124.1 (2012). The program utilizes a nine-year term, after which a "Participant" graduates. 13 C.F.R. § 124.2 (2012). A Participant that achieves its growth objectives and so no longer qualifies as small prior to the expiration of its nine-year term graduates early. 13 C.F.R. § 124.302 (2012). Once a Participant graduates early, it is no longer eligible to receive any assistance under the program. 13 C.F.R. § 124.304(f) (2012). It is, however, obligated to complete its previously awarded contracts, which permits the contractor to bid on additional task orders where a contract preapproved it to do so. 13 C.F.R. § 124.30(f)(1) (2012).

Relators admit that, two years before its insolvency, DWG was no longer a small business concern in that it had grown beyond the size that would permit it to remain in the 8(a) BD program. Doc. 76 ¶¶ 6, 72. DWG thus admits that SBA graduated DWG early. *See* 13 C.F.R. § 124.302(a)(1), (d) (early graduation for exceeding size standard); *see also A1 Procurement, LLC v. Thermor, Inc.*, 2017 WL 2881350, at *6 (E.D. Va. Jul. 5, 2017) (contractor who received notice SBA intended to early graduate contractor but who was not actually early graduated remained eligible to obtain new 8(a) set-aside contracts). Relators confirmed as much during the district court proceedings below. *See* Doc. 87 at 11 (admitting "DWG graduated from the 8(a) Program in 2010").

Relators ignore the legal consequence of DWG's early graduation after it exceeded the 8(a) BD program's size limitations—DWG was no longer a "Participant" by that term's definition. Specifically, DWG was no longer small, and it was no longer admitted to the program. Thus, it was no longer a small business concern admitted to participate in the 8(a) BD program. It had graduated early for becoming too large. *See, e.g.*, *Size Appeal of: FTSI-Phelps JV*, SBA No. SIZ-5583, 2014 WL 4804769, at \*\*8–9 (Aug. 19, 2014) (affirming SBA area office's ruling that appellant was no longer an 8(a) Participant because it had graduated from the 8(a) BD program); *In re Reality Techs., Inc.*, SBA No. BDP-455, 2012 WL 8134444, at \*2 n.2 (Nov. 21, 2012) (noting that graduate was a "former participant" and thus "considered a non-disadvantaged firm"); *In re David's Custom Roofing & Painting, Inc.*, SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010) (graduate was no longer an 8(a) BD program participant).

Remarkably, while Relators expend much effort contesting this point in their opening brief, Relators *never* direct this Court to the definition of "Participant." In fact, Relators neither cite nor discuss the definition in their entire 49-page brief. They simply ignore it, as if it never existed. Relators instead challenge the applicability of the foregoing decisions, without offering any case law or SBA administrative decisions of their own, and turn to other authorities, none of which overcomes SBA's clear definition of "Participant."

Relators state that *Size Appeal of: FTSI-Phelps JV*, SBA No. SIZ-5583, 2014 WL 4804769 (Aug. 19, 2014), "had nothing to do with the issue presented here" and that "nothing in the decision supports the District Court's reading of 'Participant.'" Br. at 32. Relators are incorrect. In *FTSI-Phelps JV*, the SBA's Office of Hearings and Appeals (OHA) considered a business's appeal of the SBA Area Office's determination that the business was ineligible to bid on a particular contract "because [it] was not in the SBA's 8(a) Business Development (BD) program." *Id.* at *1. Affirming the Area Office's finding of ineligibility, OHA explained that "the issue is . . . whether FTSI was still a program participant at the time size was to be determined," and OHA decided "FTSI was not" because it had graduated. *Id.* at **8–9. *See also id.* at *5 ("Appellant was no longer an 8(a) Participant because it had graduated from the 8(a) BD program on March 1, 2014."). The decision demonstrates SBA's interpretation of the term "participant" as excluding graduated businesses.

Relators also misunderstand *In re Reality Technologies, Inc.*, SBA No. BDP-455, 2012 WL 8134444, (Nov. 21, 2012). There, in considering a challenge to an SBA termination decision, OHA noted that a particular firm that had done a large portion of the challenger's 8(a) contract work was "a former participant in, and graduate of, the 8(a) program," and "as a result" was a non-disadvantaged firm. *Id.* at *2 n.2. *In re Reality* shows that SBA uses the term "former participant" for

graduated businesses. *See also, e.g.*, 13 C.F.R. § 124.603 (2012) (explaining reporting requirements applicable to "former Participants"). Relators similarly misread *In re David's Custom Roofing & Painting, Inc.*, SBA No. BDP-344, 2010 WL 8747273 (Mar. 16, 2010), where OHA explained that the petitioner had recently graduated from the 8(a) BD program and so was no longer a participant. *Id.* at *1.

These SBA decisions, which were contemporaneous with the events at issue in this case, show that SBA distinguishes—or at least then distinguished—between participants and graduates, the latter also being "former Participants," and that the term "participant" alone does not include graduates and former participants. In 2012, DWG was a graduate of the 8(a) BD program. It was no longer a "participant."

Disregarding the SBA's own decisions, Relators point to 13 C.F.R. § 124.515(b)(5)(i) (2012), which permits the SBA Administrator to make exceptions to certain termination requirements where a disadvantaged owner of the initial participant relinquishes stock to raise capital and, among other things, "[t]he concern has graduated." Relators fail to appreciate the exception's narrowness. Graduation occurs at the end of a participant's nine-year term as an eligible small business. *See* 13 C.F.R. § 124.302(a) (2012). The (b)(5) exception permits participants near the end of their term to raise capital in conjunction with an anticipated graduation. That exception does not alter the definition of "participant," and, contrary to Relators'

argument, that exception is not meaningless when "participant" is defined exactly as the SBA defined the term in 13 C.F.R. § 124.3 (2012).

Notably, the (b)(5) exception refers to the business post-graduation as the "concern," not the "Participant." The same can be said for section 124.304(f) (2009), on which Relators also rely. Doc. 87 at 14. That regulation states that a participant is no longer eligible to receive benefits after the effective date of early graduation or termination, and then goes on to state: "However, *such concern* is obligated to complete previously awarded 8(a) contracts . . . ." § 124.304(f) (2009) (emphasis added). In using the term "concern," this provision likewise does not alter the definition of "participant."

Relators also point to 13 C.F.R. § 124.507(d) (2012), which states that a "concern" that has graduated is eligible to be awarded an 8(a) contract if the bid date preceded the graduation, "if it was a Participant eligible for award of the contract on the initial date specified for receipt of offers contained in the contract solicitation, and if it continues to meet all other applicable eligibility criteria." *Id.* That provision involves new 8(a) contracts in the first instance and actually makes Defendants' point. The SBA consistently uses the term "Participant" only when discussing a business that is currently admitted to the 8(a) BD Program. Graduated entities, by comparison, are generally referred to by the broader term "concerns," not the more restrictive term "Participants." *See* 13 C.F.R. § 124.507(d) (2012).

Relators point to a 2016 policy manual to suggest that SBA has used "Participant" to refer to former program participants such as DWG. Doc. 87 at 19. The provision to which they point, however, does not do so. It refers to participants leaving the program because they went out of business or the individuals upon whom eligibility was based ceased to own and control the participant. SBA Standard Operating Procedure for the Office of Business Development, SOP 80 05 5, ch. 10, § 2.d (2016). It does not change the definition of "participant." Furthermore, policy manuals are not the product of notice and comment and warrant no deference; rather, they are at most entitled to "respect" if they have the "power to persuade." *E.g.*, *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 110 n.6 (2002); *United States v. Mead*, 533 U.S. 218, 234 (2001). The vague statement to which Relators point has no persuasive value.

Relators also discuss 15 U.S.C. § 637(a)(21)(A), and 48 C.F.R. § 19.812(d) of the Federal Acquisition Regulations, which require 8(a) contracts to be terminated for the convenience of the government where the owner relinquishes or agrees to relinquish ownership or control. Br. at 28, 31. Relators overlook that these provisions use the term "concerns," not "participants." In adopting its regulations limiting control and ownership requirements to "participants," as defined, SBA has interpreted the law to address concerns that are participating in the 8(a) BD program, not concerns that are no longer participants. That interpretation is reasonable and

entitled to deference. *See generally Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154, 1157 (11th Cir. 2021). Moreover, Relators have brought no challenge to the SBA's definition of "participant." They are doubtless aware of it. They simply chose to ignore it in their opening brief. They should not be heard to raise arguments regarding it for the first time in their reply brief.

In its amicus curiae brief, the government discusses the definition of "participant" but argues that the term has no fixed definition. According to the government, notwithstanding the term's definition, "participant" can include or exclude graduated entities, depending on "context." Am. Br. at 14–16 & n.4. Indeed, the government asserts that 13 C.F.R. §§ 124.106 and 124.515 use "Participant" to include graduated businesses, but the government insists its position should not be read to "imply that every use of 'Participant' in the regulation must include Program graduates." Am. Br. at 14 n.4. That is nonsensical. It is one thing to say that a defined term's meaning must be determined in context, which is the law, but it is another thing altogether to say that a defined term's meaning varies from context to context in the same section of an agency's regulations, as if the definition did not exist. The government cites no authority for such an ungrounded approach to regulatory (or statutory) interpretation.

The government also discusses a new rule the SBA issued just weeks before Relators and the government filed their briefs. *See* 88 Fed. Reg. 26164-01, 2023

WL 3115896 (Apr. 27, 2023). The new rule comments that "[t]here has been some confusion as to whether there can be a change of ownership for a former Participant that is still performing one or more 8(a) contracts," and that "[t]he proposed rule clarified that a change of ownership could apply to a former Participant as well as to a current Participant." *Id.* at 26,175. Effective May 30, 2023, the new rule amends 13 C.F.R. § 124.106 (2023), which pertains to ownership, to permit "Any Participant or former Participant that is performing one or more 8(a) contracts" to substitute a disadvantaged individual for another without requiring termination of the contract so long as SBA gives its approval prior to the change. 88 Fed. Reg. at 26,204.

That amendment apparently reads the termination requirement to apply to "Participants" and "former Participants" while at the same time distinguishing between those two groups. Indeed, the new language reinforces that "former Participants" are distinct from "Participants," which is exactly what the plain meaning and grammatical effect of those terms suggests, particularly because the concept of exiting the program is central to the regulatory scheme. *See, e.g.*, 13 C.F.R. §§ 124.301–.303 (explaining ways business may leave the program).

In all events, the new rule is not raised by Relators (who contend the regulations have not changed, Br. at 24 n.4), and should have no effect on this case, which concerns events from 2012. At all relevant times, the definition of "Participant" has been clear and not genuinely ambiguous. *See, e.g.*, *Rafferty v.*

*Denny's, Inc.*, 13 F.4th 1166, 1179 (11th Cir. 2021) (explaining that *Auer* deference is inappropriate unless a regulation is genuinely ambiguous, and *Skidmore* deference turns on the persuasiveness of the agency's action). SBA's new rule has muddied the regulatory waters, not clarified them, by departing from the clear definition of "Participant" and the previously consistent interpretations of "participant" and "former participant" seen in SBA decisions such as *FTSI Phelps JV, In re Reality Techs.*, and *In re David's Custom Roofing & Painting* and regulations such as 13 C.F.R. § 124.603 (imposing reporting requirements on "former Participants"). Under the new rule, the meaning of "Participant" now apparently shifts, much as the government suggests, from provision to provision, depending on "context." No deference, let alone retroactive application, should be given to that recent change.

Because DWG was no longer a Participant in the program, the control requirements of 13 C.F.R. §§ 124.106 and 124.515 did not apply to DWG when, in 2012, the purported change in control at issue occurred. The district court correctly ruled that Relators' falsity claims predicated on lost control fail as a matter of law.

### 2. Ownership

With respect to Relators' loss of ownership theory, the district court rejected Relators' contentions regarding DWG's supposed ineligibility for two separate reasons. First, SBA's ownership eligibility requirements are set out in 13 C.F.R. §§ 124.105 and 124.515, and, as with the related control provisions, they apply only

to "Participants." *See* 13 C.F.R. § 124.105 (2012) ("An applicant or Participant must be at least 51 percent unconditionally and directly owned by one or more socially and economically disadvantaged individuals . . . ."); 13 C.F.R. § 124.515(a)(1)(i) (2012) (stating that an 8(a) contract must be terminated for the convenience of the government if "[o]ne or more of the individuals upon whom eligibility for the 8(a) BD program was based relinquishes or enters into any agreement to relinquish ownership or control of the Participant such that the Participant would no longer be controlled or at least 51% owned by disadvantaged individuals").  Thus, just as Relators' falsity allegations regarding control fail because the control eligibility requirements were no longer applicable to DWG in 2012, Relators' falsity allegations regarding ownership fail because the ownership eligibility requirements were also not applicable to DWG in 2012.

Second, even if the ownership eligibility requirements were applicable to DWG in 2012, the district court correctly ruled that Relators failed to allege falsity regarding ownership because Relators' premise for how Gose supposedly lost his ownership fails as a matter of law.  Relators claim that NASCO's Right of First Refusal regarding Gose's shares destroyed his unconditional ownership of DWG. As a matter of law, however, it did not.

Section 124.105 requires unconditional ownership, a defined term under the SBA regulations:

> Unconditional ownership means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

13 C.F.R. § 124.3 (2012). The SBA regulations further provide:

> In determining unconditional ownership, SBA will disregard any unexercised stock options or similar agreements held by disadvantaged individuals. However, any unexercised stock options or similar agreements (including rights to convert non-voting stock or debentures into voting stock) held by non-disadvantaged individuals will be treated as exercised, except for any ownership interests which are held by investment companies . . . .

13 C.F.R. § 124.105(e) (2012).

These provisions confirm that, even if the ownership requirement applied to DWG in 2012 (which it did not), the Right of First Refusal did not destroy Gose's unconditional ownership of DWG. It did not alter Gose's 51 percent ownership of DWG's stock. Nor did it subject his ownership to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another—other than after death or incapacity, as the regulations authorized.

While the Right of First Refusal permitted NASCO to purchase Gose's stock if he agreed to sell it to a third person, and then only on the same terms, such a right is not, as Relators alleged and continue to argue, "an unexercised stock option." *See* Doc. 76 ¶ 194; Br. at 36. Nor is it an executory right. It arises, if at all, only after the owner has already agreed to sell to a third person and thus could not hinder Gose's unconditional ownership in any manner described in §§ 124.3 or 124.105(e).

The Court of Federal Claims reached this exact conclusion in *Veterans Contracting Group, Inc. v. United States*, 133 Fed. Cl. 613, 622–23 (Fed. Cl. 2017). There, the court enjoined the SBA from finding a contractor ineligible under the 8(a) BD program based on a similar right of first refusal. The court held that such a right does not eliminate unconditional ownership as defined by the SBA regulations. *Id. See also Miles Constr., LLC v. United States*, 108 Fed. Cl. 792, 801–03 (2013) (setting aside agency decision that a right of first refusal destroyed unconditional ownership).

Furthermore, to the extent Relators contend Gose lost his ownership in DWG because, under the MAS Agreement, the company's revenues were split between NASCO and Great American, supposedly ensuring Gose would not receive at least 51 percent of the annual distribution of dividends or retained earnings (*see* Doc. 76 ¶ 197; Br. at 37–38), Relators again fail to allege loss of ownership. Relators admit that DWG was insolvent and unable to perform its government contracts without the

extraordinary and fast infusion of well over $10 million in cash from its surety, Great American. Relators do not allege that any dividends or retained earnings existed or could exist at any material time.

In sum, Relators' falsity claim based on Gose's supposed loss of ownership in DWG fails for two reasons: the inapplicability of the ownership eligibility requirements after DWG graduated, and the legal insufficiency of the Right of First Refusal to destroy Gose's unconditional ownership as that term is defined. For both reasons, the district court correctly ruled that Relators' falsity claims predicated on lost ownership fail as a matter of law.

**B.    Moreover, Relators Failed to Allege Presentment of a False or Fraudulent Claim Because They Failed to Allege Anything False or Fraudulent in DWG's Task Order Bids that Extended to its Payment Requests.**

Entirely separate from whether the control and ownership requirements continued to apply to DWG after it graduated from the 8(a) BD program, the district court also dismissed Relators' claims because they failed to allege the presentment of a false claim for payment. This Court has held that the submission of a claim is "the *sine qua non* of a False Claims Act violation." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

Relators predicate their FCA claims on a fraudulent inducement theory. Relators allege that DWG submitted "false bids" for additional task orders without revealing that the company was supposedly no longer eligible for the 8(a) BD

program due to Gose's alleged loss of control and ownership. Doc. 76 ¶ 207. Relators do not claim that DWG or anyone else was required to or in fact did certify eligibility to a procuring agency as part of any task order bid or payment request. Relators nonetheless claim that by bidding on the task orders, Great American and NASCO "fraudulently induced, and/or caused DWG to fraudulent[ly] induce, the Government to award task orders under the 8(a) contracts to DWG." *Id.* ¶¶ 209, 239–40. The district court correctly ruled that Relators failed to plead the essential element of presentment of a false or fraudulent claim.

In *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 190 (2016), the Supreme Court confirmed that "[t]he False Claims Act is ***not*** 'an all-purpose antifraud statute'" that captures any "fraud" associated with a government contract. *Id.* at 194 (emphasis added). Rather, the FCA imposes liability on "any person who . . . knowingly presents, or causes to be presented, ***a false or fraudulent claim for payment or approval***." 31 U.S.C. § 3729(a)(1)(A) (emphasis added). As the district court determined, falsity or fraudulent conduct must be alleged to extend to a claim for payment. Doc. 94 at 19.

Accordingly, the district court ruled that "[f]raudulent inducement with regard to bidding on a government contract, as distinguished from submitting a claim for payment under the contract, is not available as a cause of action under the FCA." D.E. 94 at 18–19. Rather, a "fraudulent inducement claim satisfies § 3729(a)(1)(A)

only where the alleged falsity extends to a claim for payment." Doc. 94 at 19. *See also United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 335 n.130 (S.D.N.Y. 2004) (holding that "[a] bid is not a 'claim' under the False Claims Act because it does not request the payment of money").

The district court followed the correct standard. The Supreme Court's decision in *Escobar* cabined the FCA's reach by recognizing that the FCA is not an all-purpose anti-fraud statute, 579 U.S. at 194, and holding that an implied false certification claim is actionable only where, "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 190. *Escobar* shows that, to be actionable, a claim for payment must be false or fraudulent.

Relators contend that the district court misstated the law. They rely on the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). There, contractors colluded on price in their bids for a government contract, and the Supreme Court found that collusion to be a fraud that satisfied the FCA. The court held that the fraud "did not spend itself with the execution of the contract" and that "***its taint entered into every swollen estimate*** which was the basic cause for payment of every dollar paid" to the colluding contractors. *Id.* at 543 (emphasis

added).   Judge Rao of the D.C. Circuit has suggested that *Marcus* "could be understood to involve actual false claims within the plain meaning of the FCA because the inflated prices appeared on the claims themselves."  *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 425 (D.C. Cir. 2021) (Rao., J., concurring).   At a minimum, the Supreme Court recognized that the collusive bids' taint in that case entered into every claim for payment.   The district court in this case correctly required no less.

Relators also rely on *United States ex rel. Marsteller v. Tilton*, 880 F.3d 1302 (11th Cir. 2018), the only decision from this Court to discuss fraudulent inducement. *Marsteller* involved claims that a contractor supplied the government with incomplete and misleading pricing data to obtain Army contracts with inflated prices.   *Id.* at 1305–06.   The relators alleged that, in submitting its bid and later submitting invoices for payment, the contractor certified that it had complied with certain requirements applicable to government contractors but had no intention of complying with them, and that through a lack of candor regarding ethics and price disclosure requirements, the contractor deprived the Army of its ability to negotiate a reasonable price.   *Id.* at 1307.   The district court dismissed the relators' implied certification claims under the FCA as insufficient.   The district court also found that no fraudulent inducement claim had been pled, or, if one had been pled, then it failed for the same reasons supporting dismissal of the implied certification claims.

This Court observed that, after the district court ruled, the Supreme Court decided *Escobar*. This Court thus reversed and remanded the case to the district court for it to consider the relators' implied certification claims under *Escobar*'s then-new standards. The Court also found that the relators had attempted to plead fraudulent inducement claims, and, in that respect, the Court observed that "the concern is whether the pricing data was misleadingly incomplete such that it amounted to fraud, and whether that data was material to the Government's decisions on the contracts." *Id.* at 1314–15. Without deciding whether the relators actually pled viable fraudulent inducement claims, the Court remanded for the district court to address that matter along with the implied certification claims. *Id.* at 1315.

Relators also point to decisions from other circuits holding that, where fraudulent inducement results in the award of a government contract, all payments under that contract are fraudulent under the FCA, even in the absence of evidence that the payment claims were fraudulent in and of themselves. *E.g.*, *In re Baycol Prod. Litig.*, 732 F.3d 869, 876 (8th Cir. 2013); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787 (4th Cir. 1999); *see also Cimino*, 3 F.4th at 417. This Court, however, has not resolved the viability of such claims and is not bound by the decisions of these other circuits, all of which first addressed fraudulent

inducement without the benefit of the Supreme Court's recent guidance. *See Cimino*, 3 F.4th at 426–27 (Rao, J., concurring) ("The plain meaning of the FCA, the Supreme Court's recent FCA decisions, and the lack of clarity in the precedents recognizing fraudulent inducement are all reasons for reconsidering, in an appropriate case, whether fraudulent inducement is a separate cause of action under the FCA.").

The district court's decision that the alleged fraud in this case did not state a claim under the FCA because the alleged fraud was not asserted to extend to any claim for payment is entirely consistent with the Supreme Court's decision in *Escobar*, this Court's decision in *Clausen*, and the FCA's text. This is not a case in which DWG, Defendants, or anyone else allegedly made a false statement (about eligibility or otherwise) in a request for payment. This is not even a case in which someone allegedly made a false or fraudulent statement to a procuring agency in an application or bid for a contract and thereby obtained the contract under false pretenses. Relators speak broadly about Defendants or DWG having a "duty to disclose" Gose's supposed loss of control or ownership to SBA, but Relators never assert that anyone had a duty to do so to the procuring agencies in the task order bids or the claims for payment or that any of those submissions otherwise contained anything false or any misleading half-truth. In fact, in their opening brief, Relators now acknowledge there were "not affirmative misrepresentations within the *content*

of the [task order] bids or claims [for payment]," (Br. at 46 (emphasis in original)), and that "the bids or claims . . . do not contain false content . . . ." Br. at 47.

Thus, Relators admit there was nothing false or fraudulent *in* the task order bids or the claims for payments. Relators' theory is instead that "the *act* of bidding and presenting claims" (Br. at 46 (emphasis in original)) and not revealing that DWG was supposedly ineligible—without stating any misrepresentation or half-truth and without any duty to make such disclosure in any bid or claim for payment—was somehow a fraud that turned any payment request for DWG's work into an FCA violation. As the district court ruled, Relators are attempting to make the FCA into the "all-purpose antifraud statute" that the Supreme Court has squarely held it is not. *See Escobar*, 579 U.S. at 193. The district court refused to do so and correctly dismissed Relators' claims as a matter of law.

Defendants close this subpoint by noting that Relators open the argument section of their brief with a declaration that "GAIC and NASCO caused DWG to bid on task orders under DWG's 8(a) contracts while knowing and without disclosing that Gose was divested of control and 51% unconditional ownership of DWG, *which resulted in automatic termination of DWG's 8(a) contracts*." Br. at 22 (emphasis added). In so arguing, Relators appear to put forth a new, unpled theory about the supposed fraud in this case—that the act of bidding amounted to a false

representation that DWG had 8(a) contracts when those contracts actually had been automatically terminated. That theory, however, is both unpled and absurd.

In the amended complaint, Relators alleged that, due to the supposed loss of control and ownership, DWG's 8(a) contracts were "subject to mandatory termination by the Government unless the SBA granted a waiver" and were "required to be terminated no later than November 15, 2012." *Id.* ¶¶ 200, 204. Relators did not plead that the contract automatically terminated based on new factual developments. Moreover, 8(a) contracts do not simply terminate as a matter of law based on a change in facts. Doing so would disrupt federal contract work nationwide, if not threaten national security, given the number of 8(a) contracts related to national defense. Instead, contracting officers have authority to terminate contracts, 48 C.F.R. § 1.602-1(a), and they have "wide latitude to exercise business judgment" when doing so. 48 C.F.R. § 1.602-2. Further, where SBA intends to terminate a business from the 8(a) BD program, SBA must provide the business with both notice that it is the subject of a termination action and an opportunity for a hearing on the record—***before*** the termination occurs. *See* 15 U.S.C. § 637(a)(9)(A)-(B). Relators do not allege such steps occurred here, and, of course, if they had occurred, then Relators would never have brought this litigation.

## C. In All Events, Relators Failed to Plead with Particularity.

At a minimum, as the district court ruled, "even if some ground for falsity existed, and even if a cognizable fraudulent claim had been stated, Relators failed to set forth the requisite who, what, where, when, and how surrounding the supposedly false or fraudulent claims, including with respect to (1) the bids that were supposedly fraudulent and (2) the claims for payment supposedly at issue." Doc. 104 at 5. Relators' failure to meet the heightened pleading standards applicable to their claims is yet another ground supporting dismissal.

This Court has long held that a relator's complaint under the FCA must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). *E.g.*, *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005); *Clausen*, 290 F.3d at 1308–09. To plead with particularity under Rule 9(b), a complaint must set forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citations omitted).

Simply put, the relator must plead details regarding the allegedly false claims—"the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions." *Carrel*, 898 F.3d at 1276–77 (quoting *Corsello*, 428 F.3d at 1014). Some

particularities of a submission may be omitted if the complaint alleges sufficient indicia of reliability of claim submission—such as personal knowledge of, or participation in, the fraudulent conduct. *See, e.g.*, *Carrel*, 898 F.3d at 1276.

As the district court correctly found, Relators failed to meet these standards. They pled no details at all regarding even one supposedly false task order bid or even one claim for payment. The only items Relators described with particularity are some "representative examples" of task orders that DWG was awarded. *See* Doc. 76 ¶¶ 210–18. But there can be nothing false about government agency task orders themselves. The details Relators pled are thus of no moment.

Relators argue that, in fraudulent inducement cases, the particularity focus should be solely on the fraudulent inducement allegations. Br. at 46. Defendants disagree, but even if that were the case, Relators still fail to plead with particularity. Relators offer no particularity on exactly who said or did not say what, when it was said or not said, where, or how with respect to the alleged duty to disclose DWG's supposed ineligibility. If Relators contend that the absence of such disclosures was fraudulent, then Relators were required to plead the specifics of such nondisclosures. Relators failed to do so. Nor can Relators fall back on some indicia of reliability regarding their own knowledge—Relators do not allege that Gose (who is now deceased) or Berry (who was fired after he ran the company into the ground) have such knowledge or participated in the supposed fraud.

Relators contend they pled "the precise actions and events that made the act of bidding fraudulent." Br. at 47. But even if the bidding were somehow fraudulent, Relators were nevertheless required to plead the bidding with particularity. They refused to do so. They pled no information regarding what the task order bids and payment requests stated, who submitted them, or even to whom they were submitted.

Once again, and as the district court correctly observed, Relators are attempting to turn the FCA into the "all-purpose antifraud statute" that the Supreme Court has held it is not. *See Escobar*, 579 U.S. at 193. And they attempt to do so while suing the very persons who devoted extraordinary resources—and in Great American's case, tens of millions of dollars—to saving DWG and the federal construction projects it could otherwise not complete. The district court correctly dismissed Relators' claims for failure to state a claim.

On appeal, Relators make no argument that they should have been permitted leave to amend. Accordingly, the Court should affirm the district court's dismissal with prejudice.

## II. In Counts III and IV of the Amended Complaint, Relators Failed to State a Claim for Making or Using a False Record Material to a False or Fraudulent Claim under 31 U.S.C. § 3729(a)(1)(B).

In Counts III and IV of the amended complaint, Relators assert that NASCO and Great American, respectively, violated 31 U.S.C. § 3729(a)(1)(B). That provision makes it unlawful to knowingly make, use, or cause to be made or used, a

false record or statement material to a false or fraudulent claim. The district court ruled that, while claims under § 3729(a)(1)(B) do not require Relators to allege that Defendants submitted a false claim to the government, Relators must still plead a connection between an alleged false record or statement and an actual claim made to the government, and the failure to allege a false claim submitted to the government is also a failure to allege facts showing that false statements were material to a false claim. Doc. 94 at 21 (citing *Phalp*, 857 F.3d at 1154). Thus, based on the rulings that prompted the district court to dismiss Count I and II, the district court dismissed Counts III and IV with prejudice as well.

Relators do not disagree with the district court's determination that the outcome should be the same on all four counts. Accordingly, the Court should also affirm the district court's decision to dismiss Counts III and IV with prejudice.

### III. In Counts V and VI of the Amended Complaint, Relators Failed to State a Claim for Conspiracy under 31 U.S.C. § 3729(a)(1)(C).

In Counts V and VI, Relators alleged conspiracy claims against Defendants. Here too, the district court determined that if it dismissed Counts I-IV for failure to state a claim, then it should dismiss the conspiracy claims as well. Doc. 94 at 22. The district court further observed that Relators failed to identify with particularity any agreement to defraud the United States regarding task orders, when it was made, and who actually made it. *Id.*

On appeal, Relators do not disagree that the conspiracy claims should follow the result on the other claims. Relators challenge that they pled their claim with sufficient particularity, Br. at 48–49, but they fail to point to any allegations of any agreement to defraud the United States regarding task orders, when any such agreement was made, and who supposedly made it. Accordingly, the Court should affirm the district court's dismissal with prejudice of Relators' conspiracy claim.

## CONCLUSION

For all of the foregoing reasons, the Court should affirm the district court's decision to dismiss Relators' amended complaint with prejudice.

Respectfully submitted,

/s/ *Matthew E. Feinberg*
Matthew E. Feinberg
Todd M. Reinecker
PILIEROMAZZA PLLC
1001 G Street N.W., Suite 1100
Washington, DC 20001
Telephone: (202) 857-1000
Facsimile: (202) 857-0200
mfeinberg@pilieromazza.com
treinecker@pilieromazza.com

*Counsel for Appellee Native American Services Corporation*

/s/ *Matthew J. Conigliaro*
Matthew J. Conigliaro (FBN 63525)
Adam P. Schwartz (FBN 83178)
Erin J. Hoyle (FBN 117762)
CARLTON FIELDS, P.A.
4221 W. Boy Scout Blvd., Suite 1000
Tampa, Florida 33607
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
mconigliaro@carltonfields.com
aschwartz@carltonfields.com
ehoyle@carltonfields.com

*Counsel for Appellee Great American Insurance Company*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief uses 14-point Times New Roman font and, excluding the parts of the document exempted by Rule 32(f), contains 11,943 words.

/s/ *Matthew J. Conigliaro*
MATTHEW J. CONIGLIARO
Florida Bar No. 63525

## CERTIFICATE OF SERVICE

I certify that on July 5, 2023, the foregoing brief was filed and served by CM/ECF on all counsel of record.

/s/ *Matthew J. Conigliaro*
MATTHEW J. CONIGLIARO
Florida Bar No. 63525